IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| Respondent, | § | |
| | § | Case No. 4:09-CR-00390 |
| v. | § | |
| | § | Case No. 4:14-CV-01631 |
| BARRY LERNARD DAVIS, aka | § | |
| LEWIS | § | |
| Reg. No. 43653-279 | § | |

## UNITED STATES' RESPONSE TO AND MOTION TO DISMISS DAVIS'S MOTION FOR RELIEF UNDER 28 U.S.C. § 2255

TO THE HONORABLE JUDGE OF SAID COURT:

The United States Attorney for the Southern District of Texas files this response to Barry Lernard Davis (Davis)'s Motion for Relief Under 28 U.S.C. § 2255 and Motion To Dismiss. In support thereof the United States would show the following:

## I.

## PROCEDURAL HISTORY AND JURISDICTION

On July 8, 2009, the Grand Jury for the United States District Court for the Southern District of Texas, Houston Division, filed an indictment, Case No. 4:09-cr-390, in which Davis, also known as "Sir Lewis," was charged with sex trafficking of children, a violation of 18

U.S.C. § 1591(a) (count one); transportation of minors with intent to engage in sexual activity, a violation of 18 U.S.C. § 2423(a) (count two); and coercion and enticement of an individual to travel in interstate commerce to engage in prostitution or any sexual activity for which an individual would be charged with a criminal offense, a violation of 18 U.S.C. § 2422 (count three).   The indictment concluded with a notice of forfeiture (R 15-17).  On July 20, 2009, Davis entered a plea of not guilty (R 26).

On February 20, 2010, the government filed a Notice of Intent to Offer Extraneous Offenses or Acts pursuant to Rule 404(b) and 609 of the Federal Rules of Evidence (R 79).  In this Notice, the government averred that it would offer evidence: that Davis was arrested on or about February 2, 1995, and subsequently convicted of selling crack cocaine; that on or about April 17, 1995, Davis was arrested and convicted of aggravated assault with a deadly weapon; that on February 21, 2005, Davis was arrested for sexual assault of a child and for harboring a runaway; that on February 22, 2005, Davis was arrested for

compelling prostitution with a child under the age of 17; that on January 1, 2006, Davis engaged in the offense of promotion of prostitution; that in June 2006, Davis sexually penetrated a female child; that on July 10, 2006, Davis caused semi-nude photographs of the aforementioned child to be posted on the internet; in August 2006, Davis engaged in the offense of promotion of prostitution; that on September 20, 2006, Davis committed the offense of enticing persons into prostitution; that on September 21, 2006, Davis falsely told an FBI agent that he did not know the whereabouts of a missing child; that on October 12, 2006, Davis possessed child pornography and marijuana; that on October 13, 2006, Davis engaged in the offenses of pimping and pandering in Illinois; that in November 2006, Davis committed the offenses of aggravated assault, compelling prostitution by a minor, and assault on a minor; that on February 22, 2007, Davis was arrested for tampering with and fabricating evidence; that on September 13, 2007, Davis was arrested for possession of cocaine; and on January 29, 2009, Davis was arrested for driving while intoxicated (R 79-81).

On February 22, 2010, the government filed a Notice of Expert testimony (R 116).  The government proposed to offer the testimony of the following witnesses: Special Agent Pat Fransen (R 116-17) and Special Agent Vanessa Walther regarding the commercial sex industry and the commercial sexual exploitation of children (R 117-19); Larry Hovey regarding computer forensics (R 119); and Minh V. Lu, an FBI forensic computer examiner, regarding computer forensics (R 119).  On February 25, 2010, the government filed a Supplemental Notice of Expert testimony that listed the following witness: Lieutenant Matthew Gray of the Houston Police Department Internet Crimes Against Children Task Force (R 126-29).

On Davis's plea of not guilty, the case proceeded to trial beginning March 22, 2010 (R 8, DE-51).[1]  The trial concluded on March 24, 2010, when the jury returned its verdict finding Davis guilty of all three charges alleged in the indictment (R 9, DE-58; R 190-91).  The district court accepted the jury's verdict, ordered the

---

[1] "DE" refers to the district clerk's "docket entry."

preparation of a presentence investigation report (PSR) and set the case for sentencing (R 192).

The district court imposed Davis's sentence on November 12, 2010: the court remanded Davis into the custody of the Bureau of Prisons to serve concurrent 405-month terms of imprisonment on counts one and two, and a concurrent 240-month term of imprisonment on count three (R 11, DE-74; R 230).  The terms of imprisonment are to be followed by a life term of supervised release (R 231).  The district court ordered Davis to pay special assessments totaling $300 (R 233).   On November 12, 2010, the district judge filed a Final Order Directing Forfeiture of Property (R 209).

Davis appealed from the judgment of conviction and sentence.  On December 12, 2011, this Court issued an unpublished opinion affirming Davis's conviction but vacating the sentence in part and remanding for the imposition of a new sentence (SR 24-40).  *United States v. Davis*, 453 Fed. Appx. 452 (5th Cir. 2011).

The district court imposed Davis's new sentence on April 20, 2012: the court remanded Davis into the custody of the Bureau of Prisons to

5

serve concurrent 327-month terms of imprisonment as to counts one (1) and two (2) and 240 months as to count three (3) (SR 15, DE-122; SR 70). The terms of imprisonment are to be followed by concurrent life terms of supervised release (SR 71).

Davis appealed from the amended sentence. On May 3, 2013, the United States Court of Appeals for the Fifth Circuit issued an unpublished opinion affirming the amended sentence. The Supreme Court of the United States subsequently denied certiorari on October 7, 2013. *United States v. Davis*, 544 Fed. Appx. 344, *cert. denied*, 134 S. Ct. 327 (2013.

Davis filed the instant motion for relief under 28 U.S.C. § 2255 on June 9, 2014. Davis filed his motion within one year from the date that his conviction became final, thus, his motion is timely and this court is vested with jurisdiction under 28 U.S.C. § 2255. FED. R. APP. P. 4(b)(1)(A) (2010).[2] *United States v. Plascencia*, 537 F.3d 385, 388 (5th Cir. 2008) (citing *Moshier v. United States*, 402 F.3d 116, 118 (2d Cir.

---

[2]The Federal Rules of Appellate Procedure were amended in 2010 to extend the time for filing a notice of appeal from ten days to fourteen.

2005); *Sanchez-Castellano v. United States*, 358 F.3d 424, 428 (6th Cir. 2004); *Kapral v. United States*, 166 F.3d 565, 577 (3d Cir. 1999)).

II.

## STATEMENT OF FACTS

### A.   The search for a child missing from Pasadena, Texas

On September 15, 2006, Lieutenant Matthew Gray of the Pasadena Independent School District Police Department and commander of the Internet Crimes Against Children Task Force became involved in the search for a missing child, one Cassandra Martin ("CM") (R 379-81).   CM was reported to be a resident of Lighthouse Houston and a student at South Houston High School (R 382).   Lieutenant Gray recalled that the police had received a telephone call from CM's mother regarding something that had come across the internet social network "MySpace" (R 382-83).

Lieutenant Gray went online to CM's MySpace page.   There, he came upon a photograph of CM and indications that she had been online fairly recently (R 384).   Gray promptly sent a request for the Internet Protocol (IP) to My Space (R 385).   The MySpace IP logs revealed that

7

the site had been visited on September 15, 2006 (R 386).  Lieutenant Gray contacted the Internet Service Provider (ISP), America On Line (AOL), and discovered that the AOL account had  been purchased by one "Joe Davis" from an address on Radford in Houston, Texas; the e-mail address was "sensual107" (R 388-89).  Gray subsequently contacted Joe Davis and discovered that he was Davis's father (R 391).

Using the e-mail address "sensual107@aol.com," Lieutenant Gray discovered a MySpace account held by "Heather Hampton."  Gray compared the photographs found on Heather Hampton's MySpace site to those of CM and concluded that "Heather Hampton" was, in fact, CM (R 392).  Gray discovered these photographs on September 20, 2006 - five days after he became a part of the investigation.  CM was 15 years old (R 393).

Lieutenant Gray determined that "sensual107"/Cypress Creek Girl was accessing MySpace from a Ramada Inn in Louisiana (R 394, 396). Hotel records revealed that Davis had made reservations but had canceled them.  The records did not show anyone checking in under CM's name, however, there was a record for "Cassandra Gonzales," a

8

name used by CM. According to the records, "Cassandra Gonzales" checked in on September 20, 2006, and checked out one day later, September 21, 2006 (R 394-95). Hotel personnel related that two people checked in on the 20th of September: "Cassandra Gonzales" and "Charles Brigford" (USCA5 395). Lieutenant Gray conveyed this information to FBI Special Agent Patrick Fransen, the Louisiana State Police, and the New Orleans Police Department (R 396).

On September 22, 2006, Lieutenant Gray discovered that "sensual107"/Cypress Creek Girl was accessing MySpace from a hotel located in Canton, Mississippi (R 396). Hotel records revealed that Davis, using telephone number 832-978-1029, checked into the Mississippi hotel (R 397). Receipts revealed that Davis checked in on the 22nd of September and left on the 23rd (R 397).

Lieutenant Gray ultimately came into contact with CM on September 22, 2006 at the Greyhound Bus Station in Houston, Texas. CM was accompanied by her mother and an officer from the Pasadena Independent School District Police force. CM was manifestly upset - she was crying. She told Gray that she was pregnant (R 398). CM told

Lieutenant Gray that she had been with Davis and gave the lieutenant Davis' telephone number 832-978-1029 (R 399).  Once CM was found, Lieutenant Gray and the Pasadena Independent School District Police Department's participation in the investigation terminated; the case was turned over to the FBI (R 406).

FBI Special Agent Patrick Fransen was assigned to the Houston Innocence Lost Task Force, a partnership of federal and state investigators that investigated tips regarding missing and runaway children who were being put on the streets and forced into prostitution (R 566-67).  Matthew Gray contacted Special Agent Fransen for assistance in his search for CM.  After Lieutenant Gray had briefed him, Special Agent Fransen called Davis' father, Joe Davis, and told him that he had reason to believe that his son was out of state with an underage woman who was being prostituted.  He encouraged Joe Davis to call his son and urged him to contact Fransen (R 569).

Fransen soon received a telephone call from Davis.  Fransen told Davis that he knew that Davis had a child in his possession who was being prostituted.  Fransen explained that the situation had federal

10

ramifications - the girl was just 16 years old and if she was engaged in prostitution, the matter had federal consequences. He encouraged Davis to bring the child home or contact a police department for that purpose. Davis denied being with the girl and said he would have some of his "pimp partners" try to locate her (R 570, 572).

Davis did not follow Special Agent Fransen's advice to take the girl to local officials.  Two days later, Fransen received a call from Matthew Gray who advised Fransen the girl had been picked up at the Greyhound Bus Station and was now home with her mother (R 571).

Special Agent Fransen went to CM's house to introduce himself and see if he could get any information regarding what she was doing with Barry Davis.  From his experience with other teenage girls like CM, Fransen did not expect CM to cooperate. The girl met the Special Agent's expectations - she did not cooperate (R 572-73, 625).

After introducing himself to CM, Fransen reviewed the material Matthew Gray had provided showing where CM and Davis had been. Thereafter he called Donna Davis, a manager at the Ramada Inn in Metarie, Louisiana (R 574).  Fransen ultimately acquired the records of

11

the Ramada Inn documenting CM's and Davis's stay in New Orleans. He also determined that Davis stopped at a hotel in Canton, Mississippi, after he had advised Davis to either bring the girl home or take her to the nearest police station.  He recalled that he had told Davis the girl was just 16 years old (R 575).

At about the time that his investigation into the travels of Davis and CM stalled, Special Agent Fransen received a telephone call from Nichole Clock.  Ms. Clock had made an appointment to talk to Fransen. As the time for that appointment approached, Fransen went down to the entrance of the FBI offices to wait for her.  Fransen arrived at the entrance in time to see Nichole Clock getting out of a gold Mercedes driven by Davis (R 576-77).

After he finished interviewing Nichole Clock respecting an unrelated case out of Phoenix, Arizona, Fransen asked her if Davis had dropped her off that day.  Ms. Clock said he had.  Special Agent Fransen recalled that he had observed another young woman in the car with Davis and Clock who appeared to be a juvenile.  To assuage his

suspicions, he wanted to stop Davis and talk to him. Special Agent Fransen told Clock to call Davis to come pick her up (R 577, 625-26).

As Clock called, Special Agent Fransen arranged to have other law enforcement officers on hand to stop Davis when he arrived. Clock left the building in the company of a female officer. As the gold Mercedes approached the FBI offices, Davis saw Nichole Clock and the woman agent. He stopped his car in the middle of traffic, executed an awkward and illegal U-turn, and attempted to get away, albeit unsuccessfully (R 578, 626-27).

Once the vehicle was stopped, Special Agent Fransen approached. He advised Davis he was the agent who had talked to him on the telephone about CM and he wanted to know what she and Davis had been doing in Louisiana. At the same time, Special Agent Fransen asked the young lady in the back seat for her identification (R 578-79).

The girl in the back seat presented an identification card that identified her as "Cassandra Gonzales." Fransen knew that CM had used the name "Cassandra Gonzales" in Louisiana, and he knew that the girl in the back seat was not CM. Fransen pressed the girl for her

true name; the girl proved to be one Amber Case who was 18 years old (R 579-80, 628).

The officers who stopped Davis detected the aroma of marijuana emanating from inside the gold Mercedes. In fact, some marijuana was seen in console between the front seats. According to Special Agent Fransen, Davis agreed to come to the FBI offices for an interview. Reluctant to let him drive up to the offices with the marijuana in plain view, Fransen asked Davis to ride back with the officers while he drove Davis' vehicle back to the building. Davis not only agreed to ride with the officers, he signed a written consent form in which he consented to a search of the gold Mercedes (R 582-83, 628-29, 646).

Consistent with Davis' consent, the Mercedes was searched. Inside the vehicle, the officers found a cup commonly called a "pimp chalice," as well as some computer material (R 580). Emblazoned on the chalice was the name "Sir Louis" (sic) and the area code "713" (R 588-90). Special Agent Fransen observed that many pimps carried similar ostentatious chalices when they attended parties or the "players ball," and from which they drank in the presence of their fellow pimps (R 590-91).

14

Documents found with the computer revealed that it had been purchased by Davis and had been given the name "Sir Lewis" (R 595). In addition to the computer, the agents found a green notebook that contained the beginnings of a note stating that "I, C M, did nothing illegal . . ." (R 597-98, 633, 748).

After his arrest, Davis agreed to be interviewed and signed a form waiving his right to counsel and right to remain silent (R 604-05). Davis confessed that he was acquainted with CM and related that when he met her, he had taken her to a What-a-Burger (R 606). Davis denied prostituting CM, however, he observed "girls are going to do prostitution, everybody knows" (R 646). Davis also acknowledged his acquaintance with Nichole Clock and confessed that they had, on occasion, been in the same city together (R 607-08). In fact, Davis' computer contained pictures of Nichole Clock and Amber Case (R 610, 613-14). Davis denied ever visiting Ms. Clock in a Chicago hospital room where he beat her up. When asked if he had ever hit a woman with his vehicle after arguing with her, Davis replied that a girl had run into his car (R 608-09). Special Agent Fransen soon learned that Davis, Clock,

and Case had traveled to several Midwestern cities engaging in prostitution (R 614).

When asked for the last name of a photographer called "Joe" who took nude pictures, Davis was evasive. When asked what he did for a living, Davis said he was a landscaper. He denied any involvement in prostitution asserting that all his girls ever did was massage their clients, or as Davis put it, gave them "body rubs" (USCA5 609).

Special Agent Fransen took the computer material taken from Davis' automobile to Larry Hovey, a computer analyst employed by the Greater Houston Regional Computer Forensic Laboratory (R 649-51). With Barry Davis' consent to search in hand, Hovey searched the contents of Davis' computer (R 652). Hovey testified that he took the hard drive from Davis' computer and made a mirror image of it on his forensic computer (R 654). Hovey thought Davis' computer contained 2300 pictures - Special Agent Fransen asked him to review specific ones drawn from those photographs (R 656). At trial the government offered 14 photographs, Exhibits 46, 47, 48, 49, 50, 52, 53, 54, 55, 56, 57, 60, 61, and 62 (R 661-62).

Exhibit 49 came from Davis' computer and depicted a man and woman in front of a sign that read "Missouri Welcome Center." The documents and setting owner application read "Walgreens" "77 St. Louis" (R 662-63). Exhibit 54 depicted a man sitting in front of a silver laptop computer. The file path contained the date A09/17/2006" (R 664). The prosecutor linked this photograph to Exhibit 3A-10: a photograph of a woman naked from the waist down (R 664).

**B.   CM's story**

CM was born on August 27, 1990, in Chicago, Illinois to Barbara Rene Martin, *ne*, Barbara Bloom (R 407). Her stepfather was Kevin Martin (R 409). The Martin family - CM, her mother and stepfather, her sister Allison, and her brother Kevin - resided in Chicago until 2001 when they moved first to California and then to Arizona (*Id.*, R 491).

CM's childhood was riddled with difficulty. When the family moved to California, CM attempted suicide, took to cutting herself and was admitted and readmitted into mental hospitals. At one point, with cuts all over her arms, CM attacked the policemen who were trying to help her (R 410). After CM was released from custody, sometime in 2005, the

17

family moved to Texas. CM thought she may have been in the seventh grade at the time. In any event, the move to Texas did nothing to settle CM down: she ran away less than three days after her arrival.  She had no idea where she was going, indeed, she did not even know her own address (R 411-12, 491).

CM stayed away from her family for about nine months. She stayed with an assortment of acquaintances whose names she could not even recall. She related that a Metro Police officer approached her offering assistance. CM told the officer that she was a missing child who did not know where she lived and did not think her parents were searching for her. It took the officers about two hours before they located CM's parents and re-united them with her (R 412-13, 493). The reunion proved to be short-lived: CM ran away again three or four months later (R 413).

CM explained that at that time she was filled with what the song writers might call "teen spirit": she did not like being told what to do and actively rebelled. She repeatedly tried to harm herself and felt that her

parents did not care about her. She concluded that she did not want to be with them (R 413).

CM rarely attended school. She recalled that her teachers did not even know her name (R 414). When she ran away, she was about 15 years old; her sister Allison, between 12 and 13 at the time, ran away with her (*Id*).

CM recalled that her sister soon linked up with a man by the name of Anwar Posler. CM had been hooked up to Posler when she first ran away. She related Posler was abusive and she escaped the relationship. In an effort to free her sister from Posler, CM fought him.  After the fight, CM and her sister fled to a Great Western Inn off of U.S. Highway 59 and Hillcroft where they fell asleep exhausted (R 415, 496 - 507). When CM awoke, her sister was hanging up the telephone - she had been on a "chatline." After hanging up, CM's sister called Davis who came to the room shortly thereafter (R 415, 509).

Davis fastened what CM described as a ravenous look on her 12-year old sister. Uneasy with the way Davis was apprizing her sibling, CM tried to draw his attention to herself (R 416-17, 514). CM's effort to

divert Davis's attention proved successful - her sister subsequently became angry and asked them both to leave the room (R 418).

Davis and CM ended up in Davis's car. After showing CM some of his things, Davis took CM to a What-a-Burger Drive-through. They ate and then Davis took CM for a ride (R 418, 515).

The ride ended at Joe Davis' apartment on Redford. CM recalled that one of the first things that she noticed was that Joe Davis had one leg and slept on the couch in the living room because he did not get around too well. Davis had his own room (R 419). CM related that she and Davis stayed at the apartment that night and then remained there for about three months. When they met, CM told Davis that she was 18 years old (R 420). Three or four days later, Davis learned she was not 18 (*Id*).

In the apartment, Davis showed CM a collection of wigs and clothing that whet her 15-year old imagination. Within a week, the relationship became sexual (R 420-21). About three months later Davis took CM to a Red Roof Inn located off of IH-610 and Westheimer, instructed her to go into a room and put on "something sexy, which could

have been a piece of lingerie or something, but barely nothing," get the money and have sex with three individuals who had availed themselves of Davis's girls in the past (USCA5 421-22, 637). Davis told CM he had theretofore provided for her and it was time for her to provide for him (R 422, 517).

After her initiation at the Red Roof Inn, CM remained with Davis. She explained that she stayed with him to survive. In addition, she had never before had access to designer clothes like the clothes that Davis gave her (R 424). Then CM became pregnant (*Id*).

At this point CM reunited with her mother and attempted to return to school. Unfortunately, CM's mother, who was unhappy with her pregnancy and, with the father's identity being uncertain, set about to arrange an abortion for CM (R 424-25, 521-22). CM would have nothing to do with an abortion; she left home and took up shelter in a pregnancy center located in South Houston not far from where Joe Davis lived (R 425).

CM found living in the pregnancy center difficult. She had trouble adapting to the changes in her body caused by the pregnancy and

frequently became angry. The center was a church based institution and CM's outbursts, manifestly irreligious, embarrassed CM and her fellow residents. One day after school, she decided not to return to the center (R 426, 523). Getting off of the school bus, CM made her way to a Fiesta super market where she ran into Davis in his gold Mercedes.  Davis honked the horn, she saw him, and since she was at a loss as to where to go, she got into the car and went back to him (*Id*.; R 524).

CM recalled that Davis posted photographs of her on the internet on his laptop. Some of the pictures were taken off of a stock photo website and were photo-shopped. Some, however, were taken by a man CM identified as "Joe." Davis arranged for Joe to take CM to a studio in southwest Houston where Joe photographed CM (R 427-28). The photos taken by Joe at Davis' behest depicted CM in a variety of states of undress - some naked from the waist up, some naked from the waist down, and some completely undressed (R 429-31, 648). Davis told CM that the pictures taken by Joe were destined for a "higher class" website called "Eros" (R 431, 438). "Eros" was, in fact, a web site that advertised prostitution (R 611). CM related that the pictures were taken in a way to

22

hide her face which was readily identifiable from the tattoos that she had. Davis reportedly did not want anyone to identify CM because he knew that she was under age (R 445-46). Also depicted in the photographs on "Eros" was Amber Case (R 613). The audience for "Eros" was reported to be "escorts" and reviews (R 433).

Other photographs of CM were posted to her MySpace page in which she identified herself as "Heather Hampton." CM also identified herself on MySpace as "Cycreek Girl" (R 432-33). Davis had also secured a false identification document for CM using the name "Cassandra Gonzales" - a name that CM used when she ran away from home. The "Cassandra Gonzales" name was linked to an AOL e-mail address held by Davis, "sensual107." The "Gonzales" identification and this e-mail address were used to make payments on advertisements Davis posted in New Orleans and St. Louis (R 434-37, 532). The identification document was secured to show that CM was an adult although she was only 16 years old (R 437). Another document depicting CM as "Heather Hampton" described her as being 22 years old (R 438-39).

CM related that different prices were set for her services depending on whether the client came to her or whether she and Davis went to the client. For "incalls," when the client came to a specific location like the Red Roof Inn, the prices ranged from $120 for a half hour up to $180 for a full hour, and $120 beyond that. For "outcalls," when Davis and CM went to the client, the price was $200 or more per hour (R 439).

At some point, Davis decided to transport CM to St. Louis, Missouri, to engage in prostitution.  Calls from his colleagues in the commercial sex industry led Davis to believe that he could make a healthy profit in New Orleans with a white woman. Thus, en route to St. Louis in Davis' gold Mercedes, Davis and CM set up shop in New Orleans initially staying at the La Quinta Inn in Metarie, Louisiana, just off of the Causeway. Later, they made their way to the Ramada Inn (R 442-43, 534). Davis noted that there were a lot of construction workers there who might desire sexual services (R 443).  CM recalled that she and Davis checked in to the Ramada Inn. She made up the name "Charles Brigford" for Davis because he did not want to use his

24

name. CM related that she had some difficulty remembering these events because Davis had her on drugs at the time (R 444). "Cassandra Gonzales" and "Charles Brigford" checked into the Ramada Inn on September 20, 2006 and checked out on September 21, 2006 (R 445). During their stay at the Ramada Inn, CM had sex with several men per Davis' instructions (R 452, 538-39).

Donna Davis, the manager on duty at the Metarie, Louisiana, Ramada Inn, recalled the short, but eventful, stay of "Cassandra Gonzales" and "Charles Brigford" in September 2006. Davis related she was summoned to the inn's courtyard by some maintenance people where a young white woman wearing a long blond wig and a bathing suit occupied the fountain while a young black man took pictures of her (R 552-53, 555-56, 560-61). At about this time, roughly one year after New Orleans had been devastated by Hurricane Katrina, Donna Davis' hotel was occupied by contractors employed by the Federal Emergency Management Administration (FEMA) - predominantly men. Many of them were happily watching the woman in the fountain (R 554-55, 558).

The same couple - the young black man and the young woman in the wig - came to Ms. Davis' attention on one other occasion during their stay at the Ramada Inn: she saw the couple all dressed up to go out for the evening as they passed through the lobby. Ms. Davis was struck by the fact that even though the young woman was clearly pregnant, she was still engaged in Mrs. Warren's profession (R 556).

After their brief stay in the New Orleans metropolitan area, CM, now as "Heather Hampton," and Davis set out for St. Louis. They stopped in Memphis and were visiting the home of Elvis Presley, Graceland, when Davis received a telephone call from his sister. Davis' sister told him the police had a warrant and had searched the entire house looking for him. At about the same time, CM received some e-mail messages from Matthew Gray (R 453). Confident that they could not be tracked, CM ignored the messages (R 454).

In the meantime, Davis received a telephone call that caused him to take an extended stop at a rest area on the way to St. Louis. CM thought the call was from Special Agent Patrick Fransen (R 454). CM noted that Davis became upset as the conversation progressed and she

26

caught snippets from Davis that sounded like "she's not with me" (R 454-55, 540).

When the conversation ended, Davis got back into the car and told CM to turn her cellular telephone off. Davis, manifestly excited, told CM that they were looking for her. He said that they knew she was with him; he was extremely nervous (R 455). Unmoved by Davis' distress, CM turned her telephone back on - she was receiving a lot of responses to the Eros ad from individuals wanting to know when they would be in St. Louis (R 455). A disconcerted Davis debated whether to go on to St. Louis or return to Houston (R 455-56). They ultimately stopped in Canton, Mississippi (R 456).

CM and Davis spent a night in Canton.  The next morning Davis awoke panic stricken. Upon leaving the hotel room, he instructed CM to conceal her face as they made their way to the car. In the car on the way back to Houston, Davis instructed CM to draft of a letter. CM recalled that, in the letter, she identified herself and then declared that she had come along with Davis voluntarily and had not engaged in any sexual activity with him (R 458). CM wrote the note at Davis's behest.  Davis

told her that this note would be given to his attorney in the event he was charged with anything illegal (R 458-59, 541, 748).

Although the contents of the note were false, CM complied with Davis's instructions. She explained that she was afraid not to. Davis, CM said, could be violent and abusive if you did not do what he said, especially when he was drinking (R 460-61). Davis told CM to tell anyone who would ask that he was simply giving her a ride from a friend's house and they (CM and Davis) had never gone anywhere. Fearful of the consequences of failing to comply, CM followed Davis's instructions (R 461).

Davis drove CM back to Houston. He dropped her off at a Greyhound Bus Station.  Davis told CM he did not want to be with her and did not want anyone to think they were together (R 462, 542-43).

CM recalled she was walking out into the parking lot when an officer, accompanied by an older man, flashed his badge and pulled her aside. CM's mother was also there. CM related that they peppered her with questions, insisting that she respond truthfully or she would not be

allowed to go home with her mother. CM told them the story Davis had composed for her (R 463).

Eventually, CM went home with her mother, but the reunion did not last long. CM had become accustomed to being on her own and felt like she was grown up. She and her mother renewed a relationship that had been acrimonious at its best. Shortly after her return, CM left again (R 464). CM soon located Davis and returned to his stable (R 465, 546-47). CM explained she felt worthless at home as if no one cared anything at all about her.  Davis, on the other hand, provided her with things as well as the illusion of some sort of love and personal worth (R 465-67).

Her return to Davis marked a change of sorts in the relationship. At first Davis did not compel CM to engage in sex. This upset the other two girls who lived with them, however, Davis made it clear that CM was different going so far as to tattoo her with his brand, "SL," short for the usual "Sir Lewis."  CM was under the impression that Davis felt CM would not "out" him to the police (R 467-69).

CM related that Davis took her to an establishment called "Tat That Ass Too" for her "SL" tattoo. The "Tat That Ass Too" artist placed

the "SL" brand on CM's hand and neck. "Sir Lewis" was Davis' official pimp moniker (R 469-70). Davis had the brand abbreviated and placed on the back of CM's neck because he knew she would be going home to be with her child and neither Davis nor CM wanted her mother to see the tattoo (R 470).

Life with Davis could be difficult. CM recalled one occasion when she and another girl returned to the apartment somewhat inebriated. Davis was sleeping. The other girl was loud; so loud that she woke Davis. Roused from his sleep, Davis and the other girl began to argue and then to fight. Davis instructed CM to go to the car and wait for him. CM complied. Shortly thereafter Davis got into the car and started it up. The other girl stood in front of it until Davis hit her and she fell to the ground (R 471).

CM did not remain with Davis very long after her return, perhaps a month or a month and a half. One night, when Davis returned from some errands, CM told him that she had a really bad headache and asked him to get her some aspirin. Confident that it would take him some time to get the medicine, CM took between $200 and $300 from

Davis prostitution proceeds and called a taxi. She took the taxi to downtown Houston and went home (R 472).

CM recalled that Davis recruited girls with a business card. She testified he gave her one when she started and he gave her one to give to other girls as her tenure with him was running its course. The card bore his pimp designation, "Sir Lewis," and a telephone number, 832-978-1029 (R 474).

## C.   Nichole Clock's story

A lachrymose Nichole Clock testified she met Barry Davis at the Greyhound Bus Station in Houston, Texas. At that time Clock was in the process of disassociating herself from one Jeremiah Creighton, a pimp from New Jersey. Clock had been associated with Creighton for about two years (R 665-66, 727). Clock was 22 years old at the time she made Davis' acquaintance (R 666).

Clock related she had been engaged in prostitution since she was 15 years old (R 666). Clock was raised in Santa Cruz, California. Up until she was 15, she lived with her mother, her father, and her brother. She went to high school and was the number three player on the tennis

team (R 667). Nothing Clock did, however, was good enough for her father. At the age of 15, she left home (R 668).

Clock spent the first months after she left home with her sister. Eventually she got her own place. In need of money, Clock became acquainted with a pimp who said he could help and he set her up in the business (R 668-69). All of the money that Nichole Clock made was given to her pimp. She explained that this was consistent with the "rules of the game" (R 669). One of the "rules of the game," Clock explained was the prohibition of looking at other black men (R 669). According to Clock this rule was in place to insure that the prostitute did not abandon the possessing pimp for another pimp who might be cuter or more suave. Violation of this rule might net the girl a beating from either of the competing pimps (R 670).

In the "game," another principle rule proscribed that everything that the prostitute earned was turned over to the pimp. Anything the prostitute might receive was based on the relative magnanimity of the pimp. When a girl left a pimp, she left with nothing - everything belonged to the pimp (R 671).

Nevertheless some circumstances would cause a girl to leave a pimp. Some, Clock testified, were abusive. She recalled one occasion when she was kicked down several flights of stairs and, on other occasions, she was kicked when she was down on the floor. Particularly abusive pimps were known as "gorillas" (R 672). For the most part, the prostitutes called their pimps "Daddy." Nichole Clock explained that was what she wanted, a "daddy" to love and take care of her (R 674).

Leaving "daddy," or leaving one pimp for another, was a hazardous undertaking. Clock explained that a prostitute could "choose up to" another pimp by giving him "her" money. The new pimp would call the former pimp to tell him that he had his "bitch." This might leave the prostitute subject to a beating if she encountered her former pimp on the "track," that is, on the street. A beating was one of the means that the pimp might use to entice the prostitute back into his stable (R 675).

Pimps branded their prostitutes with tattoos. Nichole Clock reported that she bore the brands of four pimps. The tattoo "Blue" was for Jeremiah Creighton (R 679). The second brand Nichole Clock earned was placed on the back of her neck and "Sir Lewis." "Sir Lewis" was the

brand employed by Davis (R 679-80). Clock's other two pimps were called "Lamont" and "Dave" (R 681).

Returning to her introduction to Davis, Clock recalled that Davis was driving by the bus station when they made eye contact. Clock explained that her time on the street gave her some insight as to whether or not a woman was a prostitute or a man was a pimp. She thought Davis was cute. Davis got out of his car and gave her a business card. Clock testified that Davis did not have a source of income aside from his stable of prostitutes (R 684). Davis's business card, Government Exhibit No. 40, bore the inscription "execution and productions."  Clock confessed that she had no idea what that actually meant (R 685).

Davis took Clock to the Fifth Ward in Houston and got her some marijuana. While she smoked the marijuana and got high, Davis drank (R 686). After a period of drinking and smoking, Davis took Clock to a "spa" and dropped her off. In the parlance of the prostitution trade, a "studio," a "spa," a "ho house," or a "massage parlor," meant a place where the girls would "turn tricks" (R 686). Clock explained she and six to eight other women would stand behind a window and a "gentleman"

34

would select one of them and escort her to a room in the back where she would handle her business (*Id*).

When asked why she simply did not up and leave, Clock explained that girls were afraid of being beaten or killed. Clock herself was familiar with girls who had been killed or simply gone missing (R 687-88). According to Clock, a woman worked at the "spa" for as long as her pimp wanted her to. They might have to work for as long as five days; Clock recalled she worked three straight days for Davis (R 689-90).

Clock confessed she had an intimate relationship with Davis. After work she might come home tired and just want to sleep but Davis would make her fall asleep with "his dick in her mouth." In addition to falling asleep with Davis's phallic pacifier, Clock had to cook, clean, and take care of Joe Davis (R 691, 746).

As he did CM, Davis took Clock to different cities. Clock testified she worked for Davis in Chicago, St. Louis, New York, New Jersey and New Orleans (R 692). Clock was not sight-seeing on these trips - they were taken to make money in an expanded market. A trip might also be taken to move a girl away from her old pimp (R 693). Davis and Clock

35

traveled in Davis's car - a gold Mercedes (R 694). All of the photographs that Lovey had taken off of Davis' computer depicted Clock and Davis "hanging out" in different cities (R 698).

Some of the photographs were posted on the Internet either by Davis or by Clock (R 699-700). Government Exhibit 62 was a photograph of Clock in a wig that was used in an Eros advertisement.   Clock remarked that this photograph was remarkable for the makeup that she used to cover her black eyes. She recalled that Davis had become upset when a "trick" left a business card with her after she had completed her business with him. Davis thought that Clock had a notion to leave him so he hit her in the face breaking her nose. While she was on the floor Davis kicked her and told her to get ready, she had another client waiting (R 705-06).

Clock related that she and Davis did not part company amicably. Davis was leaving Clock in another pimp's studio to work. On their way to the studio, they had an argument for reasons that Clock could not recall. The other pimp heard Clock crying and wanted to know what was wrong. Clock hesitated because she was trying to stay "in pocket," that

is, she was trying not to talk to another pimp or black man. Clock knew that if she went "out of pocket," she could be subjected to another beating (R 707).

Clock eventually began to talk to the other pimp, whose name was Lamont, and decided to stay with him. She made this move with some trepidation: at one point Davis had held a gun to her head and told her that if she left him, he would find her and kill her (R 709-10).

Nichole Clock stayed with Lamont for two months. Lamont wanted Clock to have an abortion and she did not want one. Casting about for a place to go, Clock called Davis. Although Davis had broken her nose, Clock retained hopes that they could reunite and rekindle the "honeymoon stage," a period of happiness between she and Davis. The reunion took place in September 2006 and for a while, all was well (R 710-11).

In October 2006, Clock had an appointment at the FBI office to talk to some Arizona officers about Jeremiah Creighton. Clock and a woman FBI agent were waiting for Davis to pick her up after her interview with the Arizona officials when Davis drove up and was seized

by the officers who had been summoned by Special Agent Fransen (R 712, 744). Davis was accompanied by Amber Case - a woman that Davis had picked up (R 712-13).

After Davis, Clock, and Amber Case left the FBI offices, they set out for some work on the road. Their first stop was the New Orleans metropolitan area, to be precise, Metarie, Louisiana. Here, Amber and Clock were set up in a hotel and they worked as "escorts" - another euphemism for prostitution (R 715-16).

From New Orleans, they headed up the Mississippi River to St. Louis. Once again Case and Clock worked and Davis collected the money. To sustain his girls in their endeavors, Davis took them to fast food restaurants where they could select items from the dollar-menus (R 717-18). Davis had Case and Clock charge their clients $120 for a half hour which entitled the client to a "blow job," or oral sex. A full hour, which would include vaginal intercourse, cost $180 per hour and $120 beyond that hour (R 719). An advertisement posted on the Eros web site reflected that Case, Clock, and Davis were in St. Louis on October24, 2006, and in Chicago on October 27, 2006 (R 720).

38

The trip to Metarie and to St. Louis passed without incident. In Chicago, however, Clock and Davis had an argument that caused Clock and Case to rethink life with Lamont. Clock had become ill with pelvic inflammatory disease (PID), a consequence of the abortion Lamont had forced her to have, and had to go to the hospital. Case called Davis and told him they were in the hospital. Davis, not one inclined to show compassion, came to the hospital and began beating and choking Clock in her hospital room (R 721-22, 723-24). The altercation came to an end and Clock was saved when the hospital security staff arrived and escorted Davis from the hospital. When she was able to leave, security personnel took Clock to the airport where she caught a flight back to Houston (R 722-23).

Clock was too frightened to press assault charges against Davis (R 723). Clock explained that it was against the rules to "tell on your daddy" for something like that (R 723). October 2006 marked the last time that Nichole Clock confronted Barry Davis until she testified at his trial (R 731).

**D.**   **Special Agent Vanessa Walther: summarizing the case against Davis**

On October 12, 2006, FBI Special Agent Vanessa Walther witnessed Nichole Clock's interview with Special Agent Fransen and escorted her to the door (R 755). Special Agent Walther explained that many of the girls who become involved in prostitution and who were not victims of sexual abuse did so in a quest for love, affection, and attention. To this end, the relationship with the pimp often began as one of boyfriend-girlfriend (R 758-59). Walther observed this initial relationship, the "recruitment" phase, might last as long as three months (R 759).

When the recruitment phase ended, the girls were subject to a set of rules, some of which have actually been written down (R 759). One of the rules requires the girl to refer to the pimp as "daddy." Indeed, the pimp's telephone number is listed on the girls' cellular telephones under the name "daddy." To enforce the relationship between the prostitute and her "daddy," the girl's contact with other people was restricted by another rule:

> Basically a girl is told that she should not date another black
> male, because he might be a pimp.  She is not allowed to
> make eye contact with another pimp.  Because if she does,
> she is considered to be what they call "out of pocket."  And
> that will allow that pimp that she has made contact with to
> actually take her and the money that she has on her, if she
> has any at that time.  And she becomes his property at that
> point.

(R 760).

Walther testified that pimps often maintained a notebook in which they would record the amount of money made during an "outcall," or the prostitute would write a note for the pimp (R 761-62). Walther also related that pimps carried their "pimp chalices" around with them to affairs held by, and for, pimps as status symbols. In addition to the notebook, the 21st century pimp might have a laptop computer on which he would advertise his girls on the Internet (R 763).

Pimps, Walther observed, occasionally traveled with their girls on a circuit. The circuit might take them to specific cities or to events where a lot of potential clients might assemble (R 765). To facilitate and develop their business, pimps maintained a network of communication. On this network, pimps might learn where law enforcement's presence was heavy or where particular "tracks" or "spas" were located (R 765-66).

Walther testified it was difficult for a prostitute to leave her pimp. She explained that if the initial love relationship waned or was lost, the pimp might turn the charm back on and lure the girl back to him. Alternatively, the pimp employed fear to keep a girl in place - he might beat her or threaten harm to her family (R 767). Special Agent Walther compared the pimp/prostitute relationship to an abusive domestic relationship: with no place to go, the abused party returned to the abuser (R 767-68).

## E.   Instructions and closing arguments

After Special Agent Walther testified, the government rested (R 781). Davis succinctly moved for a judgment of acquittal asserting without elaboration that the evidence was insufficient to support a finding of guilt as a matter of law. The district court denied Davis' motion (*Id*).

In its charge, the district court instructed the jury:

I remind you that it is your job to decide whether the government has proved the guilt of the defendant beyond a reasonable doubt.  In doing so, you must consider all of the evidence.  This does not mean, however, that you must accept all of the evidence as true or accurate.  You are the sole judges of the credibility or believability of each witness and

42

the weight to be given the witness's testimony.  An important part of your job will be making judgments about the testimony of the witnesses who testified in this case.  You should decide whether you believe what each person had to say and how important that testimony was.  In making that decision, I suggest you ask yourself a few questions: Did the person impress you as honest?  Did the witness have any particular reason not to tell the truth?  Did the witness have a personal interest in the outcome of the case?  Did the witness have any relationship with either the government or the defense?  Did the witness seem to have a good memory?  Did the witness have the opportunity and ability to understand the questions clearly and to answer them directly?   Did the witness's testimony differ from the testimony of other witnesses?

(R 800-01). The district court concluded its submission of the charge with instructions respecting what the government had to prove to sustain a finding of Davis' guilt (R 803-07).

The government opened its argument with the proposition that CM was lured into the world of prostitution by someone preying upon her need for love, attention, and affection (R 811-12). The prosecutor noted that Davis enticed CM with his car, a meal, and clothes. When Davis had sufficiently drawn her into his world, he placed her in a room with three individuals for sex in consideration for which Davis would be compensated (R 812-13). Once drawn into the world of commercial sex,

43

CM was afraid to leave: she was afraid if she left or if she failed to engage in sex, she would be beaten (R 813).

The government declared that Davis knew that CM was not 18 - it came out on her MySpace page and Special Agent Fransen told Davis CM was underage (R 814). From the advertisements and the photographs, the jury could reasonably infer that Davis conveyed CM across state lines to hotels to engage in sexual acts (R 815). The government averred that circumstances such as the fact that Davis used a cellular telephone, crossed state lines and stayed in hotels that were part of a national chain, allowed the jury to conclude that his conduct was in and affecting interstate commerce (R 815-16). Moreover, the photographs found on his computer supported the finding that Davis had transported a juvenile across state lines to engage in sexual activity for money (R 816).

Turning to the evidence supporting a finding of guilt on count three of the indictment, the government noted how Davis recruited Nichole Clock from the bus station in Houston, Texas, and how he

bought marijuana for her and placed her in a "spa" (R 818). The prosecutor tersely alluded to the rules of the prostitution game:

> And the rules of the game: you don't look at another black man. You don't get out of pocket. You work for me. You are my property. And it was brilliant, because unlike a commodity that one sells, he sold these girls over and over and over again. And everything he did was to better that commodity; got their hair done, bought lingerie, put ads online. It was all to make more money.

(USCA5 818). As the prosecutor neared the end of her argument, she alluded to the testimony of Special Agent Walther pointedly noting the similarity in the vocabulary of the prostitute witness and the FBI Special Agent: "And what words did she use? The same words that Nichole Clock and [CM] used. In pocket, out of pocket. You can't look at another black man. That there is abuse, that there are threats, that there is (sic) drugs" (R 820).

In his response to the government's argument, Davis focused on the credibility of the witnesses who testified against him. He noted that both CM and Nichole Clock spent some time with the government agents and lawyers preparing for trial (R 826-27). Davis observed that both CM and Clock lived a lie - pointedly noting that they would lie to satisfy

their pimp (R 828). Davis suggested that the government had replaced the pimp and they would lie to meet the expectations of the prosecutor (R 829). Thereafter, Davis assailed the verity of CM's testimony with particular emphasis on how Davis reportedly led her into the world of prostitution (R 830-31).

With respect to the charge set out in count two of the indictment, Davis took pains to suggest that the government had failed to adduce any convincing evidence that he was present in Louisiana or Mississippi with CM on the dates alleged in the indictment (R 832-33).  Davis suggested that Special Agent Fransen did call somebody in Mississippi but it was not Davis that he talked to (R 835-36).  Finally, Davis assailed the credibility of Nichole Clock (R 836-39).

In its rebuttal, the government returned to the notion that CM and Nichole Clock became prostitutes to satisfy a desire for love, attention, and affection that was missing in their young lives. The government stressed the fact that their lives were not based on lies (R 840). The prosecutor urged the jury to consider the witnesses' testimony and ask

themselves who did the women appear to be afraid of - the agents, the prosecutors, or the defendant? (R 841).

After meeting Davis on the credibility of the witnesses, the prosecutor outlined the work the agents did in developing the case and bringing it to trial (R 842-45). Davis' argument proved unavailing: after due deliberation, the jury returned its verdict: Davis was found guilty of all three charges alleged in the indictment (R 847-48). The district court accepted the jury's verdict, ordered the preparation of a pre-sentence investigation report and set the case for sentencing (R 849-51).

## III

## DAVIS' GROUNDS FOR RELIEF

Davis grounds his motion for relief under 28 U.S.C. § 2255 on the proposition that his Sixth Amendment right to the effective assistance of counsel was abrogated. Davis advances the following alleged deficiencies in support of this proposition:

A. Counsel failed to lodge an objection to testimony that interjected Davis' race into the proceeding;

47

B. As a result of counsel's failure to prevent the injection of race into the prosecution, Davis' right to equal protection of the law was violated:

C. Counsel failed to discover precedent that would have enabled him to lodge an objection to testimony regarding the "culture of prostitution" that resulted in the injection of his race into the trial;

D. Counsel's failure to object to the "culture of prostitution" testimony resulted in his having to raise the issue as plain error on appeal;

E. Counsel failed to bar application of a five-level increase to his offense level computation;

F. Counsel did not adequately object to the recommendations of the pre-sentence investigation report (PSR); and

G. Counsel failed to file a motion to suppress evidence.

**IV**

**RULES REGARDING INEFFECTIVE ASSISTANCE OF COUNSEL**

It is well settled that ineffective assistance of counsel complaints are analyzed under the rule promulgated by the Supreme Court in

*Strickland v. Washington*, 466 U.S. 668 (1984). This analysis proceeds in two steps: (1) the court determines whether counsel's performance fell below an objective standard of reasonableness and (2) whether there is a reasonable probability that but for counsel's unprofessional errors the result of the proceeding would have been different. *Hinton v. Alabama*, 134 S. Ct. 1081, 1088 (2014) (citing *Padilla v. Kentucky*, 559 U.S. 356, 355 (2010) (quoting *Strickland*, at 688, 694)); *United States v. Bernard*, _ F3d _, 2014 WL 3906272 (5th Cir. Aug.11, 2014).

The first prong in the analysis, constitutional deficiency, is necessarily linked to the practices and expectations of the legal community. "The proper measure of attorney performance remains simply reasonableness under prevailing professional norms." *Hinton*, 134 S. Ct. 1088 (quoting *Padilla*, 559 U.S. at 366 and *Strickland*, at 688). In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's performance was reasonable considering all the circumstances. *Id*. (quoting *Strickland* at 688). "Under *Strickland*, 'strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually

unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigations. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.'" *Hinton*, at 1088. An attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance. 134 S. Ct. at 1089. Counsel's performance is strongly presumed to fall within the wide range of reasonable professional assistance. Counsel's performance is evaluated in light of all the circumstances existing at the time of counsel's conduct. *Bernard*, _ F.3d at _, 2014 WL 3906272 * 2.

The second prong of the ineffectiveness analysis entails a demonstration "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. … When a defendant challenges a

50

conviction, the question is whether there is a reasonable probability that, absent the errors, the fact-finder would have had a reasonable doubt respecting guilt." *Hinton*, at 1089 (quoting *Strickland*, at 694, 695). Stated otherwise, to establish prejudice, the defendant must show "that his attorney's errors were so serious that they rendered the result of the trial unreliable or the proceeding fundamentally unfair." *Bernard*, at _, 2014 WL 3906272 * 2.

In *Bernard*, the Fifth Circuit, quoting *Harington v. Richter*, 562 U.S. 86, _, 131 S. Ct. 770, 790 (2011), observed:

> Although courts may not indulge "*post hoc* rationalization" for counsel's decision making that contradicts the available evidence of counsel's actions, ... neither may they insist counsel confirm every aspect of the strategic basis for his or her actions. There is a "strong presumption" that counsel's attention to certain issues to the exclusion of others, reflects trial tactics rather than "sheer neglect." ... After an adverse verdict at trial even the most experienced counsel may find it difficult to resist asking whether a different strategy might have been better, and, in the course of that reflection, to magnify their own responsibility for an unfavorable outcome. *Strickland*, however, calls for an inquiry into the objective reasonableness of counsel's performance not counsel's subjective state of mind.

F.3d at _, 2014 WL3906272 * 2.

**V**

51

## MOTION FOR SUMMARY JUDGMENT:
## APPLICATION OF THE LAW TO THE FACTS

**A.   Counsel's failure to object to or prevent admission of testimony touching upon the "culture of prosecution did not abrogate Davis' right to the effect assistance of counsel (Consolidated response to Davis' first four grounds for relief)**

Davis' first four grounds for relief (Petition, pp. 1-16) focus upon the erroneous admission testimony regarding the "culture of prostitution" which turned racial "allowing the jury to consider race as a factor in determining guilt." *United States v. Davis*, 453 Fed. Appx. 452, 455 (5th Cir. 2011). The Fifth Circuit noted that Davis' trial counsel failed to object at trial thus relegating its review to one for plain error. *Id.*

Under the plain error standard of review, Davis bore the burden of demonstrating (1) there was an error; (2) the error is plain; and (3) the error affected substantial rights, was prejudicial and affected the outcome of the district court proceeding. If this burden is satisfied, relief on appeal is discretionary: the court of appeals exercises its discretion "to correct such an error only if it 'seriously affects the fairness, integrity, or public reputation of judicial proceedings.'" *Davis*, 453 Fed.

Appx. at 455. To secure relief under plain error a defendant is required to show "the alleged error affected the outcome of trial." *Id.*, at 456 & n. 4 (citing *Olano v. United States*, 507 U.S. 725, 734 (1993); *United States v. Marcus*, 130 S. Ct. 2159, 2166 (2010); *Puckett v. United States*, 556 U.S. 129, 129 S. Ct. 1423, 1429 (2009)).

Here, it must be conceded that counsel's failure to object constitutes deficient performance. Moreover, the admission of the testimony and the ensuing reference to it by the government in closing adversely affected Davis' substantial right to equal protection. To be entitled to relief for ineffective assistance of counsel, however, Davis must show "that his attorney's errors were so serious that they rendered the result of the trial unreliable or the proceeding fundamentally unfair." *Bernard*, at _, 2014 WL 3906272 * 2. The test for prejudice prong under the *Strickland* standard for ineffective assistance of counsel mirrors the prejudice prong of the plain error standard of review applied by the court of appeals.

Davis did not satisfy his burden of demonstrating prejudice on direct appeal and he cannot satisfy it herein. On appeal, the Fifth Circuit determined that Davis was not entitled to relief from the conviction:

> To obtain relief, however, Davis must also persuade us that there is a reasonable probability that the outcome of his trial would have been different without this testimony. In *Anderson*, we concluded that the error was harmless beyond a reasonable doubt because it was not probable, given the overwhelming evidence against the defendant that the verdict would have been different had the testimony been excluded. Davis correctly points out that the challenged testimony was repeated four times over the course of the trial, whereas in *Anderson* it was heard by the jury only once and not repeated by the prosecutor during his closing argument. While we agree that this distinguishes this case from *Anderson*, Davis has not demonstrated that these repetitions were sufficient to make it reasonably probable that the jury's verdict was influenced by them.

> The evidence presented against Davis during the three-day trial was overwhelming. Two women testified to their personal experiences working as Davis's prostitutes, one while she was only fifteen years of age, and the details of their stories corroborated one another. Evidence from Davis's computer, from his car, and from a New Orleans employee also linked Davis to the interstate prostitution business and to the women testifying against him. Finally, a local police officer and two FBI agents testified to their investigations into the crimes alleged against Davis. Given the wealth of evidence amassed against him, we cannot conclude that there is a reasonable probability that the jury would have come to a different conclusion regarding Davis's guilt if the four

statements about looking at black men had been excluded by
the district court.

453 Fed. Appx. at 458.

The Fifth Circuit found that the improper admission of testimony
touching upon the culture of prostitution and the ensuing implication of
Davis's race did not undermine the reliability of the trial or abrogate
Davis's right to equal protection. This holding implicates the law of the
case doctrine. "The law of the case doctrine posits that when a court
decides upon a rule of law, that decision should continue to govern the
same issues in subsequent stages in the same case." *Pepper v. United
States*, 131 S. Ct. 1229, 1250 (2011). The doctrine directs a court's
discretion but does not limit the tribunal's power. Thus, if a court is
convinced its prior decision was clearly erroneous and would work a
manifest miscarriage of justice, it may grant relief. *Id.*

In *United States v. Matthews*, 312 F.3d 652 (5th Cir. 2002), the
Fifth Circuit observes that when an issue of fact or law is decided on
appeal, it may not be reexamined by the district court on remand or by
the appellate court on a subsequent appeal. There are three exceptions
to the general rule: (1) where evidence at a subsequent trial is

55

substantially different; (2) where there has been an intervening change in the law by a controlling authority; and (3) where the earlier decision is clearly erroneous and would work a manifest miscarriage of justice. Here, the *Strickland* test for prejudice is consistent with the plain error standard for prejudice. Consequently, the issue presented by Davis herein was resolved against him on direct appeal.

Once issues in a particular case have been raised and decided on a direct appeal, then they are barred from collateral review under 28 U.S.C. § 2255. *United States v. Kalish*, 780 F.2d 506, 508 (5th Cir. 1986); *United States v. Rocha*, 109 F.3d 225, 229 (5th Cir. 1997). ("[i]t is settled in this Circuit that issues raised and disposed of in a previous appeal from an original judgment of conviction are not considered in § 2255 Motions") (citing *United States v. Jones*, 614 F.2d 80, 82 (5th Cir. 1980)). The court of appeals resolved the issue of prejudice on direct appeal. The government is entitled to summary judgment denying Davis relief on these issues.

**B.    Counsel's performance at sentencing was not deficient (consolidated response to Davis's fifth and sixth Grounds for Relief)**

In his fifth Ground for Relief, Davis complains that his attorney abrogated his right to the effective assistance of counsel at sentencing by failing to secure relief from the five-level adjustment recommended by the probation officer for Davis's engagement in a pattern of activity involving prohibited sexual conduct, U.S.S.G. § 4B1.5(b)(1) (PSR ¶ 68). According to the probation officer and the investigative files of the Houston Police Department, Davis had been charged with the offense of compelling prostitution of a child under 17 years of age (PSR ¶ 81) and sexual assault of a child (PSR ¶ 82). Both of these charges were dismissed by the State of Texas on November 18, 2005. The probation officer described the conduct underlying these charges at length in The Offense Conduct section of the PSR (PSR ¶¶ 5-7). The probation officer noted that Davis had been "released on bond and state charges related to this incident were subsequently dismissed" (PSR ¶ 7).

To show prejudice in the sentencing context, a petitioner must show "a reasonable probability that but for trial counsel's errors his non-capital sentence would have been **significantly** less harsh." *United*

*States v. Segler*, 37 F.3d 1131, 1136 (5th Cir. 1994)(citing *Spriggs v. Collins*, 993 F.2d 85, 88 (5th Cir. 1993)).  Under this standard, the court must consider such factors as the defendant's actual sentence, the potential minimum and maximum sentences that could have been received, the placement of the actual sentence within the range of potential sentences, and any relevant mitigating or aggravating circumstances.  *Id.*

In *Glover v. United States*, 531 U.S. 198, 121 S.Ct. 696 (2001), the Court put a somewhat different gloss on the notion of ineffective assistance of counsel at sentencing when it held that any increase in a sentence stemming from an error that would have been correctable on appeal establishes the prejudice prong of *Strickland*. 531 U.S. 198, 121 S.Ct. at 700-01.  *Glover* turns largely on an attorney's failure to object to an error of law that affects the calculation of a sentence.  Such a failure results in prejudice if the alleged error was correctable.  531 U.S. 198, 121 S.Ct. at 700.  The Supreme Court remanded the case for an assessment of the reasonableness of counsel's performance.

After *Glover*, the Fifth Circuit modified the significantly less harsh test of *Spriggs v. Collins*, *supra*. In *United States v. Grammas*, 376 F.3d 433 (5th Cir. 2004), the Court held that *Glover* abrogated the "significantly less harsh test" and replaced it with an "any actual amount jail time" test. Stated otherwise, the prejudice prong of the *Strickland* standard is satisfied if the petitioner shows that counsel's deficient performance resulted in any amount of prison time above that the petitioner would have received if the forfeited complaint had been advanced at trial or on appeal. 376 F. 3d at 438, 439. The Court pointedly noted that the new test applied to the then mandatory federal guideline regime. *Grammas*, at 438 n. 4. Since *Grammas*, the mandatory federal sentencing guideline regime has been held to be unconstitutional and federal sentences under an advisory guideline scheme are tested for "reasonableness."

Prior to the imposition of his sentence, Davis, through counsel, objected to the propriety of the five-level adjustment. The district court overruled this objection and applied the five-level increase. Davis

challenged the application of the five-level adjustment on appeal. The court of appeals affirmed:

> Davis argues that the district court could not use these allegations as the basis of the enhancement because they were not credible. We disagree. The PSR stated that all of its claims regarding Davis's conduct with RD were based on the investigative reports of the Houston Police Department. These allegations therefore had a sufficient evidentiary basis and indicia or reliability, which permitted the district court to rely on them in determining Davis's sentence.

453 Fed. Appx. at 461.[3]

In his motion for relief under 28 U.S.C. § 2255, Davis faults his attorney for failing to discover and offer evidence to refute the recommendations of the PSR (Davis 2255 Motion, pp. 17-23). Davis contends reasonable counsel would have subpoena witnesses to show that reputed victim of the dismissed charge, RD, was not credible. Davis overlooks several pertinent facts that undermine his contention. First, Davis's attorney lodged an objection to the recommended five-level adjustment. Second, the probation officer alerted the district judge that

---

[3] In the Application Notes to U.S.S.G. § 4B1.5, the Sentencing Commission advises sentencing courts that "an occasion of prohibited conduct may be considered for purposes of subsection (b) without regard to whether the occasion (I) occurred during the course of the instant offense; or (II) resulted in a conviction for the conduct that occurred on that occasion." U.S.S.G. § 4B1.5, comment. (n. 4(B)(ii)).

the state charge had been dismissed (PSR ¶¶ 7, 81, 82). Finally, the issue before the court was whether Davis had engaged in a "pattern of sexual activity," not whether he had been convicted of an offense. *See* U.S.S.G. § 4B1.5, comment. n. 4(B)(ii). Thus, even if counsel had subpoenaed someone to attest to the fact that the charge had been dismissed, the district court could have applied the adjustment in the face of any testimony touching upon the credibility of RD and the fact of dismissal. In sum, Davis has failed to demonstrate that his attorney's performance was deficient or that any deficiency in counsel's representation adversely affected the sentence imposed. Relief on this ground as well as the general assertion that his attorney failed to offer evidence to impeach the reliability of the PSR (Davis Motion, p.iv) should be summarily denied.

## C.   Counsel's decision not to file a futile motion to suppress did not affect Davis's right to the effective assistance of counsel

Davis complains that his attorney abrogated his right to the effective assistance of counsel by failing to file a motion to suppress evidence despite Davis's insistence that a motion to suppress be filed. This complaint is set out in a conclusory fashion without any briefing to

support (Davis Motion, p. iv). From the facts adduced at Davis's trial, one may reasonably infer that Davis is alluding to the evidence taken from his gold Mercedes-Benz.

The record reflects that Davis was lawfully stopped when he executed an illegal U-turn in an effort to avoid agents when he returned to FBI offices to pick up Nichole Crumb. At the time of the stop, the officers detected the aroma of marijuana and saw marijuana in plain view. Thereafter, Davis consented to a search of the conveyance (R.578, 626-27, 582-83, 628-29, 646). Viewing these circumstances from counsel's perspective at the time of trial, counsel's decision not to file a motion to suppress must be deemed reasonable. In light of Davis's consent to the search, a motion to suppress the evidence would have proved futile. Counsel is not required to file meritless motions. *United States v. Gibson*, 55 F.3d 173, 179 (5th Cir. 1995). Relief on this ground must be denied.

**VII.**

**EXPANSION OF RECORD; NEED FOR EVIDENTIARY HEARING; DENIAL OF CERTIFICATE OF APPEALABILITY**

**A.      Expansion of record**

Under the Rules following Section 2255 Proceedings, the record may be expanded to include materials that pre-date the filing of the motion for relief under 28 U.S.C. § 2255 affidavits. Rule 7, Rules following 28 U.S.C. § 2255. The record in the case-at-bar should be expanded to include all of the materials filed in the criminal case, Case No. 4:09-CR-00390.

**B.      Need for an evidentiary hearing**

The Fifth Circuit has held that a "district court need not hold an evidentiary hearing to resolve ineffective assistance of counsel claims where the petitioner has failed to allege facts which, if proved, would admit of relief. . . . If on the record before us, 'we can conclude as a matter of law that [the petitioner] cannot establish one or both of the elements necessary to establish his constitutional claim, then an evidentiary hearing is not necessary and we may affirm." *United States v. Fields*, 565 F.3d 290, 298 (5th Cir. 2009) (quoting and citing *Clark v. Collins*, 19 F.3d 959, 964 (5th Cir. 1994) and *United States v. Walker*, 68 F.3d 931, 934 (5th Cir. 1995)), *see also*, *United States v. Acklen*, 47 F.3d

739,743-44 (5th Cir. 1995).  The Court has instructed district judges to employ a two-step inquiry:

> First, the district court should examine the record in the case as supplemented by the judge's "personal knowledge or recollection" to determine if the record conclusively negates the facts asserted by the movant. ... Second, the district court should decide whether the movant would be legally entitled to post-conviction relief if his factual allegations are true (at least those allegations not conclusively refuted by the record or the judge's personal knowledge or recollection. ... If the district court resolves these two prongs in favor of the movant, "§ 2255 requires it to conduct an evidentiary hearing based on those factual allegations which, if found to be true, would entitle the petitioner to post-conviction relief."

*United States v. Ochoa*, 127 F.3d 34, 1997 WL 589346 (5th Cir. 1997)(unpublished) (citing *Friedman v. United States*, 588 F.2d 1010, 1015 (5th Cir. 1979)).  An evidentiary hearing is not required.  Davis has not alleged any facts that would support a finding that he was denied his right to the effective assistance of counsel at trial or at sentencing.  This Court can resolve the issues with resort to the record presented at trial. The government is entitled to an Order granting it summary judgment and denying Davis relief under 28 U.S.C. § 2255.

## C.  <u>Certificate of Appealability</u>

Before Davis can perfect an appeal from an order denying him relief under 28 U.S.C. § 2255, he must secure a certificate of appealability. 28 U.S.C. § 2253. "A certificate of appealability may issue pursuant to 28 U.S.C. § 2253(c), 'only if the applicant has made a substantial showing of the denial of a constitutional right.'" *United States v. Ratliff*, 719 F.3d 422, 424 (5th Cir. 2013) (quoting *Slack v. McDaniel*, 529 U.S. 473, 481 (2000)). "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution or his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *United States v. Bernard,* _ F.3d _, 2014 WL 3906272 * 1 (5th Cir. Aug. 11, 2014) (quoting *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, *supra*).

Here, reasonable jurists would not debate the correctness of a holding that Davis has failed to make a substantial showing that he was denied a constitutional right.

# VIII

## <u>CONCLUSION</u>

In light of the foregoing, the government prays that this Court

enter an order summarily denying Davis relief under 28 U.S.C. § 2255.

Respectfully submitted,

KENNETH MAGIDSON
United States Attorney

<u>/s/ James L. Turner</u>
JAMES L. TURNER
Assistant United States Attorney
Texas Bar No. 20316950
Federal ID No. 1406
ATTORNEYS FOR
RESPONDENT
P. O. Box 61129
Houston, TX  77208-1129
(713) 567-9102

66

## **CERTIFICATE OF SERVICE**

I, James L. Turner, hereby certify that a true and correct copy of the foregoing Response To Barry Lernard Davis (Davis)'s Motion for Relief under 28 U.S.C. § 2255 has been served on September 9, 2014 via certified mail, return receipt requested, addressed to:

Mr. Barry Lernard Davis
Reg. No. 43653-279
Beaumont Medium FCI
Inmate Mail/Parcels P.O. Box 26040
Beaumont, TX 77720

/s/ James L. Turner
JAMES L. TURNER
Assistant United States Attorney