IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| Plaintiff-Respondent, | § | |
| | § | |
| V. | § | CRIMINAL ACTION NO. H-09-390 |
| | § | CIVIL ACTION NO. H-14-1631 |
| BARRY LERNARD DAVIS, | § | |
| | § | |
| Defendant-Movant | § | |

## MEMORANDUM AND RECOMMENDATION

Before the Magistrate Judge in this federal habeas corpus proceeding pursuant to 28 U.S.C. § 2255 is Movant Barry Lernard Davis's § 2255 Motion to Vacate, Set Aside or Correct Sentence (Document No.163),[1] and Memorandum in Support (Document No.164), the United States's Answer and Motion to Dismiss Movant's § 2255 Motion (Document No.170), and Movant's Response to the Government's Motion to Dismiss (Document No. 178). After reviewing the parties' submissions, the record of the proceedings before the District Court in the underlying criminal case, and the applicable case law, the Magistrate Judge RECOMMENDS, for the reasons set forth below, that the Government's Motion to Dismiss (Document No. 170) be GRANTED, and that Movant Barry Lernard Davis's § 2255 Motion (Document No.163), be DENIED.

## I.  Procedural History

Movant Barry Lernard Davis ("Davis"), who is currently in the custody of the United States Bureau of Prisons, is seeking federal habeas corpus relief under 28 U.S.C.§ 2255. This is Davis's

---

[1] Barry Lernard Davis's Motion to Vacate, Set Aside or Correct Sentence can be found at Document No. 1 in Civil Action H-14-1631 and at Document No. 163 in Criminal Action No. H-09-390.

first attempt at § 2255 relief.

On July 8, 2009, Davis was charged by Indictment with sex trafficking of children in violation of 18 U.S.C. §1591(a) (Count One), transportation of minors with intent to engage in sexual activity in violation of 18 U.S.C. § 2423(a) (Count Two), and coercion and enticement of an individual to travel in interstate commerce to engage in prostitution or any sexual activity for which an individual would be charged with a criminal offense in violation of 18 U.S.C. § 2422 (Count Three). (Document No. 1). Following a three day trial, the jury found Davis guilty of all Counts. (Document No. 58).

Prior to sentencing, a Pre-Sentence Investigation Report ("PSR") was prepared. (Document No.71, 73), to which Davis filed written objections (Document No. 69). In particular, he objected to PSR ¶ 5, 6, 7, and 18. The objection states in pertinent part:

> These paragraphs all refer to the Defendant's relationship with R.D. as State case that was subsequently dismissed. R.D. did not testify at trial and the Defendant objects to the presentence investigation report containing information pertaining to R.D. which was taken from the government files. Said information is hearsay and the Defendant was denied the right to confront and cross-examine this witness. Defendant objects to this information being contained in the presentence investigation report.

Davis also objected to the five level enhancement based on his engaging in a pattern of activity involving prohibited sexual conduct. His objection to PSR ¶ 68 states in pertinent part:

> The evidence is insufficient to show that the defendant engaged in a pattern of activity involving prohibited sexual conduct. There is only one minor alleged in the indictment and for which the Defendant was convicted and no evidence that the defendant engaged in prohibited sexual conduct with a minor on at least two separate occasions. Therefore the increase of 5 points in this paragraph is improper.

The Government responded to Davis's objections to the PSR. (Document No. 70). The Government argued that the five-level enhancement to base offense level under U.S.S.G. § 4B1.5(b)(1), applied because there were two separate occasions and, contrary to Davis's arguments, did not require two

separate convictions or two separate minors.  As for the two separate occasions, the Government wrote:

> In the case at bar, Barry Davis engaged in a prohibited sexual conduct when he encouraged other men to have sex for money with the minor C.M. in Houston, New Orleans *and* St. Louis, and when he encouraged other men to have sex for money with the minor R.D. (the latter's occurrence detained in Paragraphs 5-7 of the original PSR.  (emphasis in original).

The record shows that Davis had a combined adjusted offense level of 32.  His offense level was increased by five levels under U.S.S.G. § 4B1.5(b)(1), which resulted in an adjusted offense level of 37, and with a criminal history category of V, Davis  had an advisory guideline sentencing range of 324 to 405 months.

Davis was sentenced on November 12,  2010, to a term of imprisonment of 405 months on Counts One and Two, and a term of imprisonment of 240 months on Counts, all terms to be served concurrent, for a total term of imprisonment of 405 months, to be followed by a life term of supervised release.  Davis was further ordered to pay a special assent of $300.  (Document No. 74, Transcript of Sentencing Hearing, Document No. 95, 11-16).  In imposing a 405-month sentence, Judge Harmon stated:

> All right.  Barry Lernard Davis, also known as Sir Lewis, stands before the Court for sentencing after being found guilty at trial of sex trafficking of children, transportation of minors with intent to engage in criminal sexual activity, and coercion and enticement.
>
> The evidence revealed that the defendant was engaged in the promotion of prostitution, that he recruited juvenile and adult females to engage in prostitution, and that he traveled across the United States seeking clients to engage in prostitution with the juvenile and adult prostitutes he had recruited.
> He has three prior felony drug convictions, one felony conviction for aggravated assault, and one misdemeanor driving while intoxicated conviction.
>
> The guidelines as calculated in this case adequately capture the factors in this offense and I believe that a sentence at the high end of the guideline range is appropriate in this case.  Also, a life term of supervised release will allow the probation officer to

monitor the defendant's reintegration into the community and provide him with any
needed community referrals or sex offender treatment.

(Document No. 95 p. 10-11).  Judgment was entered on November 23, 2010.  (Document No. 79).

Davis appealed his conviction to the Fifth United States Court of Appeals arguing that his equal

protection rights were violated; that the evidence against him was insufficient to support his

convictions; that the Court erred in it application of the five-level enhancement as a repeat and

dangerous sex offender under U.S.S.G. § 4B1.5(b)(1); and in its application of the two-level multiple

count adjustment under U.S.S.G. § 3D1.4 based upon Davis's conduct with "R.D."  The Fifth Circuit

rejected all of Davis's arguments except for his contention that Court erred in using Davis's conduct

with "R.D." as the basis for a "pseudo count" under U.S.S.G. § 2G1.3, which resulted in a two-level

multiple count adjustment under U.S.S.G. § 3D1.4.  Based on this determination, the Fifth Circuit

vacated Davis's sentence as to Counts One and Two and remanded the matter for re-sentencing.

*United States v. Davis*, 453 Fed. Appx. 452 (5th Cir. 2011).

        A revised PSR was prepared (Document No.117), to which Davis filed written objections.

(Document No. 116).  With an adjusted offense level of 30, which was increased five levels pursuant

to U.S.S.G. § 4B1.5(b)(1), Davis had a total adjusted offense level of 35.  With a criminal history

category of V, and a total offense level of 35, Davis had an advisory guideline sentencing range of

262 to 327 months.  Davis was re-sentenced on April 20, 2012, to a term of imprisonment of 327

months on each of Counts One and Two, and to a term of imprisonment of 240 months as to Count

Three, all terms to run concurrent, for a total term of imprisonment of 327 months, to be followed

by a life term of supervised release.  (Document No. 122 and Transcript of Re-Sentencing Hearing,

Document No. 137). In imposing Davis's 327 month sentence, Judge Harmon stated:

        All right.  I understand your frustration, but I can't do anything about that today.  All
        I can do today is re-sentence you on the two counts that the Fifth Circuit has told me

I made an error on.

So, I'm ready to proceed to re-sentence on those two counts unless there's anything else anyone would like to say.

Mr. Davis is before the Court for re-sentencing after being found guilty at trial of sex trafficking of children, transportation of minors with intent to engage in criminal sexual activity, and coercion and enticement

.

He — the evidence revealed that he was engaged in the promotion of prostitution, that he recruited juveniles and adult females to engage in prostitution, and that he traveled across the United States seeking clients to engage in prostitution with the juveniles and adult prostitutes he had recruited.

He has three prior felony drug convictions, one felony conviction for aggravated assault, and one misdemeanor driving while intoxicated conviction.

I believe that the guideline range as recalculated in this case adequately captures the factors in this offense and that a sentence at the high end of the guideline range is appropriate and meets the sentencing objectives of deterrence, incapacitation, and punishment and is an adequate sanction pursuant to 18 United States Code Section 3553(a). (Document No. 137, p. 11-12).

Davis appealed his sentence to the Fifth Circuit Court of Appeals, again challenging the

application of a five-level enhancement to his offense level. The Fifth Circuit rejected Davis's

argument that its earlier opinion allowed him to "offer new evidence to rebut the PSR and found his

challenge unpersuasive in light of its earlier decision affirming the five-level adjustment. *United

States v. Davis*, 544 Fed. Appx. 344 (5th Cir. 2013). Davis filed a petition for certiorari. The United

States Supreme Court denied his petition on October 7, 2013. (Document No. 157). Davis had one

year from the denial of certiorari to file a § 2255 motion or until October 7, 2014. On or about June

9, 2014. Davis timely filed the instant § 2255 motion (Document No.163), and Memorandum in

Support (Document No. 164). Davis argues that he was denied his constitutional right to effective

assistance of counsel. The Government has answered and has moved to dismiss Davis's § 2255

motion. The Government maintains that Davis has not and cannot show he was prejudiced by the

alleged deficiencies.

## II. Discussion

### A. Ineffective Assistance of Counsel claims

Claims of ineffective assistance of counsel are generally measured by the standard of *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, a petitioner must be able to show that his counsel was deficient and that the deficiency prejudiced him to the extent that a fair trial could not be had. *Strickland*, 466 U.S. at 687. Deficiency is judged by an objective reasonableness standard, with great deference given to counsel and a presumption that the disputed conduct is reasonable. *Id*. at 687-88. The prejudice element requires a petitioner to prove that absent the disputed conduct of counsel, the outcome would have been both different and more favorable. *Id*. at 694-95. Under *Strickland*, a petitioner must establish both deficiency and prejudice prongs to be entitled to habeas relief. The failure to establish either deficient performance or prejudice makes it unnecessary to examine the other prong. *United States v. Seyfert,* 67 F.3d 544, 547 (5th Cir. 1995).

Under the deficiency prong of *Strickland*, judicial scrutiny of counsel's performance is "highly deferential" and "a strong presumption" is made that "trial counsel rendered adequate assistance and that the challenged conduct was the product of reasoned trial strategy." *Wilkerson v. Collins*, 950 F.2d 1054, 1064-65 (5th Cir. 1992), *cert. denied,* 509 U.S. 921 (1993) (citing *Strickland*). To overcome the presumption of competence, the petitioner "must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Strickland*, 466 U.S. at 690. Under the prejudice prong of *Strickland,* a petitioner must be able to establish that absent his counsel's deficient performance, the result of his trial could have been different. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id*. at 691.

When ineffectiveness claims relate to counsel's performance at sentencing, as raised herein, *Strickland's* deficiency prong is met when counsel fails to "research facts and law and raise meritorious arguments based on controlling precedent. *United States v. Fields*, 565 F.3d 290, 296 (5th Cir.), *cert. denied*, 558 U.S. 914 (2009)(citing *United States v. Conley*, 349 F.3d 837, 841 (5th Cir. 2003)). In addition, "'any amount of [additional] jail time has Sixth Amendment significance.'" *Lafler v. Cooper*, ___U.S.___, 132 S.Ct. 1376, 1386 (2012)(quoting *United States v. Glover*, 531 U.S. 198, 203 (2001)). Counsel is not required to "anticipate changes in law or raise meritless objections." *Fields*, 565 F.3d at 296.

Constitutionally effective assistance of counsel under *Strickland* is not errorless counsel. The determination of whether counsel has rendered reasonably effective assistance turns on the totality of facts in the entire record. Each case is judged in light of the number, nature, and seriousness of the charges against a defendant, the strength of the case against him, and the strength and complexity of his possible defense. *Baldwin v. Maggio*, 704 F.2d 1325, 1329 (5th Cir. 1983), *cert. denied,* 467 U.S. 1220 (1984). The reasonableness of the challenged conduct is determined by viewing the circumstances at the time of that conduct. *Strickland,* 466 U.S. at 690. "We will not find inadequate representation merely because, with the benefit of hindsight, we disagree with counsel's strategic choices." *Kitchens v. Johnson*, 190 F.3d 698, 701 (5th Cir. 1999) (quoting *Green v. Johnson*, 116 F.3d 1115, 1122 (5th Cir. 1997)). Conclusory allegations of ineffective assistance of counsel do not raise a constitutional question in a federal habeas petition. *Miller v. Johnson,* 200 F.3d 274, 281 (5th Cir), *cert. denied*, 531 U.S. 849 (2000) (citing *Barnard v. Collins,* 958 F.2d 634, 642 (5th Cir. 1992); *Ross v. Estelle*, 694 F.2d 1008, 1012 (5th Cir. 1983)).

The United States Supreme Court in *Harrington v. Richter*, ___U.S.___, 131 S.Ct. 770, 778 (2011) discussed *Strickland* in the context of a habeas proceeding involving a state conviction.

While *Harrington* did not involve a federal habeas proceeding involving a federal conviction, the Court's discussion of *Strickland* and ineffective assistance of counsel claims is instructive and equally applies to claims brought in a federal habeas proceeding such as those raised herein.

With respect to ineffective assistance of counsel claims, the Court observed that "[t]here are, [ ] 'countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.' Rare are the situations in which the 'wide latitude counsel must have in making tactical decisions' will be limited to any one technique or approach." *Id.* at 788-89 (quoting from *Strickland*, 466 U.S. at 689). As a result, counsel's performance does not fall below that guaranteed by the Sixth Amendment where it can be shown that counsel formulated a strategy that was reasonable at the time and balanced limited resources with effective trial tactics and strategies. *Harrington*, 131 S.Ct. at 789. "Just as there is no expectation that competent counsel will be a flawless strategist or tactician, an attorney may not be faulted for a reasonable miscalculation or lack of foresight or for failing to prepare for what appear to be remote possibilities." *Harrington*, 131 S.Ct. at 791. Moreover, "it is difficult to establish ineffective assistance when counsel's *overall* performance indicates active and capable advocacy." *Harrington*, 131 S.Ct. at 791 (emphasis added). Finally, in considering the prejudice prong of *Strickland*, the likelihood of a different result must be substantial, not just conceivable. *Id.* at 791-792 (Citations omitted). As a result, "'[s]urmounting *Strickland's* high bar is never an easy task.'" (quoting from *Padilla v. Kentucky*, 559 U.S. 356, 371(2010)). In part, because:

> Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom.

*Harrington*, 131 S.Ct. at 778 (citations omitted). The *Strickland* standard applies to ineffective assistance of appellate counsel claims. *Smith v. Robbins*, 528 U.S. 259, 285 (2000).

The background facts relevant to Davis's claims were summarized by the Fifth Circuit:

On September 15, 2006, Pasadena Independent School District officer Matthew Grey was alerted to the disappearance of CM, a 16-year old pregnant female from Houston, Texas. During his investigation, Officer Gray discovered that someone was accessing CM's my space account using an America Online subscription owned by "sensual 107." Another my space webpage associated with "sensual107" displayed nude photographs of CM. The American Online account was traced back to Joe Davis, who told the police that it had been opened with his credit card by his 32-year-old son, Barry Davis. Continued monitoring revealed that CM's my space account was being accessed from a hotel in New Orleans, Louisiana, where she was checked in under the alias "Cassandra Gonzales." Several days later it was accessed from a hotel at which Barry Davis was staying in Canton, Mississippi.

Officer Gray contacted Special Agent Patrick Fransen of the Federal Bureau of Investigation ("FBI") for assistance. Agent Fransen asked Joe Davis to tell his son Barry to contact him. At trial, Agent Fransen testified that Barry Davis called him that same evening, denied knowledge of CM's whereabouts, and promised that he would check with some of his "pimp partners" to see if he could find her. Two days later, a very upset CM met her mother and Officer Gray at a Greyhound Bus Station in Houston, Texas. She told Officer Gray that she had been with Davis, and gave him a cell phone number matching the one used by Davis in prostitution advertisements and when checking in to the hotel in Canton, Mississippi. CM refused to cooperate any further.

Around this same time, Agent Fransen received a telephone call from Nichole Clock about an unrelated case. When she arrived at his office, Agent Fransen noticed that Clock was in a car driven by Barry Davis, and that another girl who appeared to be a juvenile was in the backseat of the vehicle. He instructed Clock to call Davis to come pick her up. When Davis saw Agent Fransen, he unsuccessfully attempted to flee.

When asked who she was, the girl in the backseat of the car initially gave Fransen a false identification card with the name "Cassandra Gonzales," the same alias used by CM. She eventually admitted that her real name was Amber Case and that she was 18 years old. Davis consented to a search of his car, in which officers discovered marijuana and a "pimp chalice" emblazoned with both "Sir Louis" and "713," Davis's cell phone area code. They also found a laptop computer belonging to Davis named "Sir Lewis" that contained photographs of CM, Clock, and Case, and a spiral notebook with a note stating: "I [CM], did nothing illegal." When asked if he was prostituting these girls, Davis replied that "girls are going to do prostitution,

everybody knows, and that all of his girls only gave "body rubs" to their clients.

At trial, Officer Gray and Agent Fransen testified about all of the facts uncovered during their investigation. CM and Clock also testified on behalf of the government about their experiences with Davis.

CM told the jury that she was a repeat run-away. At the age of 15, while living on the street, she moved in with Barry Davis in Houston, Texas. She testified that she told Davis she was a minor before their relationship became sexual. Three months later, Davis ordered her to have sex with three men for money, as it was time for her to give back to Davis for having provided for her.

CM explained that she continued to prostitute for Davis in order to survive and to keep the material goods that he gave her, such as designer clothes. Several months later she became pregnant and returned home. A short while later, however, and still pregnant, she returned to Davis. She testified that Davis advertised her services online using nude pictures, several of which were shown at trial, and took her to Memphis, Tennessee and New Orleans, Louisiana, to prostitute for him. Donna Davis, a hotel employee in Matarie, Louisiana, testified about one of their stays at her hotel, including a scene they created when Davis had provocative pictures of CM taken in the hotel's fountain.

Davis brought CM back to Houston, CM testified, after receiving a call from Agent Fransen. Davis told CM that "they" were looking for her and ordered her to write a note in his spiral notebook stating that she had never engaged in sexual activity with him. CM obeyed because she was afraid of Davis, who was abusive. Davis left CM at a Greyhound bus stop where she met her mother and Officer Gray. Once again, however, CM found life home difficult and returned to Davis. This time Davis had her tattooed with "SL," which stood for him pimp moniker "Sir Lewis." A month later CM ran away from Davis for the last time.

Nichole Clock also testified at trial about her time prostituting for Davis. Clock told the jury about the "rules" used by pimps to maintain control over the women who prostitute for them, and stated that Davis had her tattooed with his pimp moniker, "Sir Lewis," on the back of her neck. She explained that she prostituted for Davis because they were romantically involved and because she was afraid of him. She also claimed that he took her to multiple cities to prostitute, including Chicago, St. Louis, New York, New Jersey and New Orleans. Pictures of Clock and Davis in several of those cities were found on Davis's computer and presented at trial. Clock eventually ran away from Davis, but returned to him in September 2006. She left him permanently after Davis attacked her while she was in the hospital.

453 Fed. Appx. at 454-455.

Davis's first four grounds for relief relate to the admission of testimony regarding the

"culture of prostitution," which he claims turned racial and thereby allowed the jury to consider race as a factor in determining guilt. Davis claims that counsel failed to object to the testimony, and to the prosecutor's closing argument, which made reference to the questionable testimony, and that he was prejudiced by counsel's failure and was denied his right to equal protection. According to Davis, he told his attorney that he never acted as a pimp for Nicole Clock or for Cassandra Martin. Davis also maintains that had counsel researched relevant Fifth Circuit case law such as *United States v. Anderson*, 560 F.3d 575 (5th Cir. 2009), a similar prostitution case, where race was interjected, he would have been prepared to respond to such testimony concerning race and prostitution. Davis further claims that because of counsel's failure to object, he was held to a more stringent standard of review on direct appeal than he would have been had counsel objected.

The Government concedes that counsel could have and should have objected to the testimony at issue, and to the ensuing reference to it by the Government in closing. The Government further concedes that "the admission of the testimony and the ensuing reference to it by the government in closing adversely affected Davis's substantial rights to equal protection." (Document No. 170, p. 53). As such, counsel's failure to object constitutes deficient performance under *Strickland*. The *Strickland* inquiry does not end here. To be entitled to relief on an ineffectiveness of counsel claim, Davis must show deficient performance *and* that he was prejudiced. The Government argues that Davis's has not shown he was prejudiced within the meaning of *Strickland* and therefore is not entitled to relief. The Magistrate Judge agrees.

The Fifth Circuit in its thorough review of Davis's claims relating to the "culture of prostitution" that resulted in the injection of race into the trial, found that Davis had not shown that the admission of the four statements affected the outcome of the proceedings. The Fifth Circuit's analysis is instructive and binding because the *Strickland* prejudice test mirrors that of the plain error

standard of review, which was applied by the Fifth Circuit, to Davis's challenge to the admission of

the testimony touching upon the "culture of prostitution", and distinguishing Davis's case from

precedent, and ultimately concluding that the admission of the "culture of prostitution" testimony

did not undermine the reliability of the trial or abrogate Davis's right to equal protection. The Fifth

Circuit wrote:

> It is undisputed that prosecutorial use of a criminal defendant's race as evidence of guilt violates that defendant's due process and equal protection rights. Davis alleges that the government engaged in such conduct during his trial four times by eliciting racial testimony and repeating it during the prosecution's closing argument. That testimony, Davis argues, impermissibly suggested to the jury that Davis- a black man-was more likely by virtue of his race to be a pimp, and therefore guilty of the crime charged against him.

> The first time that the jury heard the challenged testimony was during the direct examination of Nichole Clock, a former prostitute who testified for the government regarding her experience with Davis as her pimp and about the rules used by Davis and other pimps to coerce prostitutes into remaining under their control. Clock explained that she gave all the money she earned to Davis because she was required to do so by "the rules of the game."

> Prosecutor: And do [pimps] all pretty much go by this code of rules?

> Clock: Yes.

> Prosecutor: Can you give me an example? What are some of the rules that these pimps would have?

> Clock: You can't look at other black men. All the money goes to them.

> Prosecutor: Let's slow down. Why can't you look at other black men? I would assume there is a reason for the rules; is that correct?

> Clock: Yes.

> Prosecutor: Why can't you look at other black men?

> Clock: Because they are afraid that they will lose you for the next black man.

> Prosecutor: How is that possible?

Clock:  They could be cuter.  They could be nicer.  They could be more suave, I guess.

Prosecutor:  What if you looked at them, what would happen?

Clock:  Sometimes you would get in trouble, like, getting your a** beat.

Prosecutor:  Who would beat you?

Clock:  Either your pimp or the one you looked at.

Later during Clock's testimony, the prosecutor repeated this testimony when asking Clock how she had come to work for Davis.

Prosecutor:  How did you meet the defendant?

Clock:  I believe he drove by and we made eye contact, and then he got out of the car and came over and talked to me.

Prosecutor: Okay.  But wasn't that dangerous for you to make eye contact with him?  He is a black male.

Clock:  He is, but I knew that [my pimp] was in [another city], so there wasn't anything that he could do to me.

Another government witness, FBI Special Agent Vanessa Walther, was also called by the prosecution to testify about how the "rules of the game" are used by pimps to control prostitutes.  She gave a similar account.

Prosecutor: When you say there are rules about how [prostitutes] relate to other pimps, what are you talking about?

Agent Walther:  Basically a girl is told that she should not date another black male, because he might be a pimp.  She is not allowed to make eye contact with another pimp.  Because if she does, she is considered to be what they call "out of pocket."  And that will allow the pimp that she has made eye contact with to actually take her and take the money that she has on her, if she has any at that time.  And she becomes his property at that point.

Finally, the prosecution referred back to this testimony during its closing argument.  After reviewing evidence that Davis had coerced girls and women into working as prostitutes for him, the prosecutor stated:  Everything they did was completely controlled by Barry Davis.  And the rules of the game:  You don't look at another black man.  You don't get out of pocket.  You work for me.  You are my property.  And it was brilliant, because unlike a commodity that one sells, he sold these girls

over and over again.

Both parties agree that the testimony in this case closely resembles testimony that this court held was erroneously admitted in *United States v. Anderson*. In that case, an FBI special agent testifying about the culture of prostitution stated that prostitutes avoid making eye contact with black males because of the risk that "he might be another pimp." We concluded then, as we do now, that it was error for the court to allow such testimony. "Testimony from a prosecution witness stating or implying that persons of the same race as the defendant are more likely to commit certain crimes is impermissible, both on constitutional grounds and because its probative value is outweighed by it danger of unfair prejudice. As in *Anderson*, the government argues today that this testimony was permissible because it was for the innocuous purpose of showing how pimps coerce prostitutes into working for them. While this may have been the intention, error nonetheless occurred when the testimony turned racial such that it may have implied to a reasonable juror that the defendant was more likely to have been a pimp by virtue of being a black male.

To obtain relief, however, Davis must also persuade us that there is a reasonable probability that the outcome of his trial would have been different without this testimony. In *Anderson*, we concluded that the error was harmless beyond a reasonable doubt because it was not probable, given the overwhelming evidence against the defendant, that the verdict would have been different had the challenged testimony been excluded. Davis correctly points out that the challenged testimony was repeated four times over the course of the trial, whereas in *Anderson* it was heard by the jury only once and not repeated by the prosecutor during his closing statement. While we agree that this distinguishes this case from *Anderson*, Davis has not demonstrated that these repetitions were sufficient to make it reasonably probable that the jury's verdict was influenced by them.

The evidence presented against Davis during the three-day trial was overwhelming. Two women testified to their personal experiences working as Davis's prostitutes, one while she was only fifteen years of age, and the details of their stories corroborated one another. Evidence from Davis's computer, from his car, and from a New Orleans employee also linked Davis to the interstate prostitution business and to the women testifying against him. Finally, a local police officer and two FBI agents testified as to their investigations into the crimes alleged against Davis. Given the wealth of evidence amassed against him, we cannot conclude that there is a reasonable probability that the jury would have come to a different conclusion regarding Davis's guilt if the four statements about looking at black men had been excluded by the district court.

The cases relied on by Davis are not inapposite. Davis points to three cases where circuit courts found reversible error based on testimony linking the defendant's alleged criminal actions to his ethnic background. In each of these cases, however, the challenged testimony was significantly more pervasive and inflammatory than it

was here. In *United States v. Vue*, a customs officer testified against defendants of Hmong descent, and repeatedly stated that persons of Hmong descent controlled approximately 95% of the opium trade in that region. Unlike in this case, the references made were not cursory, but instead constituted a considerable portion of the testimony of the government's key witness. Given the pervasive nature of these statements "injecting] ethnicity into the trial" and "clearly inviting] the jury to put the Vues' racial and cultural background into the balance in determining their guilt," the court concluded that the admission of their guilt," the court concluded that the admission of the evidence was not harmless beyond a reasonable doubt and thus that the Vue's convictions were subject to reversal.

In *United States v. Doe*, a circuit court again concluded that the admission of testimony by an expert witness was not harmless error. In that case, an expert witness repeatedly emphasized control over the drug trade by Jamaicans. In its closing statement, the prosecution repeatedly referred to this testimony, referred to the defendants as "Jamaicans," and made inflammatory statements that "Jamaicans . . . [are] coming in [and] taking over the retail sale of crack in Washington D.C.," and Jamaicans are "coming into the apartments, they're taking them over, they're using them for drugs, they're using them to package the drugs, to cook them, and to sell them on the street. The Court concluded that these racial arguments coupled with the "hardly overwhelming" evidence of guilt presented against the defendants meant that the admission of the testimony was not harmless error.

Finally, in *United States v. Rodriguez Cortes*, the district court admitted into evidence an identification card showing that the defendant was of Colombian descent. This card had virtually no probative value; it was used by the government instead to argue that it showed the defendant was Colombian and therefore that known Colombian drug dealers would have trusted him. The prosecutor stated in closing, "[y]ou also have a Colombian I.D. . . This man, this young man has ties with Colombia, from there you can reasonably infer why Libardo Sierra was calling him his friend." The court concluded that in context, the sole purpose of the admitted evidence was an appeal to the jury to believe that a person born in Colombia must be involved in drug trafficking.

The challenged testimony and prosecutorial statement in Davis's case, while improper, were not of such frequency, length, or of such an inflammatory nature as to call into doubt the overall fairness of his trial. The improper statements constituted only a few cursory references in the course of a three-days trial during which the government presented a great deal of direct and circumstantial evidence on all three counts against the defendant. Thus, because he has not shown that the error affected the integrity of the proceeding below, Davis is not entitled to relief on his first ground of appeal.

*Davis*, 453 Fed. Appx. at 456-459. Here, Davis cannot show that he was prejudiced within the

meaning of *Strickland* by counsel's failure to object to the testimony about the "culture of prostitution." The evidence of guilt was strong based on the testimony of the agents involved in the investigation into Davis's prostituting minors, the minors, an employee at the motel where they Davis and one victim stayed in the New Orleans area. As such, Davis's four ineffectiveness claims related to the "culture of prostitution" testimony fail under *Strickland.*

Davis next argues that counsel was ineffective for failing to bar application of a five-level increase to his offense level computation and for failing to adequately object to the PSR. According to Davis, he told his counsel that he never acted as a pimp of Nicole Clock and Cassandra Martin. He further claims that he told counsel that he did not have a sexual relationship with R.D. or Cassandra Martin, and that with respect to R.D., that the case had been dismissed because R.D. was not a credible witness. Davis contends that had counsel investigated Davis's background and prior criminal history he would have known that the charges had been dismissed. Davis claims that counsel was silent at sentencing and made no attempt to contradict the government's arguments. According to Davis, had counsel had been successful, his advisory guideline sentencing range would have been 151 to 188 months, which was significantly less than 262 to 327 months. The Government counters that counsel's performance at sentencing was not deficient.

Again, the record undermines Davis's contention that counsel failed to object to the PSR, and in particular, the five-level increase. To the extent that Davis claims that counsel could have done more to refute the recommendation of the PSR, shown that the victim, R.D. was not credible and the state charges were dismissed, the record shows that the PSR expressly states that "on November 18, 2005, the charges were dismissed pursuant to a motion by the state which noted "other" as the reason." (Document No. 71, ¶¶ 81 & 82). Thus the Court was aware the charges had been dismissed and, in any event, would not have made a difference because the Application Note made clear that

a conviction was not required for the five-level increase to apply. In addition, counsel appealed the application of the five-level increase to the Fifth Circuit Court of Appeals. The Fifth Circuit affirmed the Court's application of the sentencing guidelines. The Fifth Circuit wrote:

> The district court's decision to apply the five-level enhancement was based on the PSR. The PSR alleged that Davis had engaged in sexual conduct with RD, a sixteen-year-old girl, on at least two occasions, and had acted as RD's pimp. All of these allegations were based on the investigative files and reports of the Houston Police Department. In 2005, Davis was arrested and questioned, and released on bond. State charges related to the incident were eventually dismissed for unspecified reasons. Given the similarity of this conduct and Davis's conduct with CM, the PSR concluded that Davis had engaged in a pattern of activity involving prohibited sexual conduct with minors, and therefore that he was subject to a five-level enhancement under the guidelines.

> Davis argues that the district court could not use these allegations as the basis of the enhancement because they were not credible. We disagree. The PSR stated that all of its claims regarding Davis's conduct with RD were based on the investigative reports of the Houston Police Department. These allegations therefore had a sufficient evidentiary basis and indicia of reliability, which permitted the district court to rely on them in determining Davis's sentence.

> In order to overcome this presumption of reliability, Davis must provide evidence that these allegations are materially untrue. He has failed to do so. Before the district court, Davis objected that "there is insufficient evidence to show that the defendant engaged in a pattern of activity involving prohibited sexual conduct." On appeal, he repeats his claim of insufficient evidence, and alleges that the state dismissed the charges against Davis due to lack of evidence against him. However, Davis does not provide anything, other than these unsupported assertions, to demonstrate that the PSR's allegations are baseless or that lack of evidence was the reason why the charges against him regarding his alleged conduct with RD were dismissed. Because Davis has not shown that the district court erred in relying on the PSR when applying the five-level enhancement under U.S.S.G. § 4B1.5(b)(1), his claim for relief is denied.

*Davis*, 452 Fed. Appx. at 461. Davis also argues that his counsel was ineffective for failing to adequately object to the PSR. As discussed above, counsel filed written objections to the PSR. Davis's assertion that the objections were not adequate because the Court overruled them is wholly conclusory. The fact that the objections were overruled and failed to change the outcome does not

mean that his attorney's performance was deficient. *Youngblood v. Maggie*, 696 F.2d 407, 410 (5th Cir. 1983). Davis fails to assert any facts in support of his argument. Conclusory allegations are insufficient to raise an issue of ineffective assistance of counsel. *Miller v. Johnson*, 200 F.3d 274, 282 (5th Cir. 2000)("[C]onclusory allegations of ineffective assistance of counsel do not raise an issue in a federal habeas proceeding."). This ineffectiveness claim fails.

Moreover, the evidence and argument considered by the Fifth Circuit on appeal is essentially the same evidence and argument offered by Davis concerning his ineffectiveness claims challenging the "culture of prostitution" and five level sentencing increase. Because there has been no intervening change in the law, and no showing that the Fifth Circuit's decision is "clearly erroneous or would work a manifest injustice," the undersigned Magistrate Judge is bound by the findings and conclusions of the Fifth Circuit. *Matthews*, 312 F.3d at 657 (The law of the case doctrine "has three exceptions: (1) The evidence at a subsequent trial is substantially different; (2) there has been an intervening change of law by a controlling authority; and (3) the earlier decision is clearly erroneous and would work a manifest injustice."); *Rocha*, 109 F.3d 225, 229 (5th Cir. 1997) (claims decided on direct appeal are barred from collateral review in a § 2255 proceeding). Those findings and conclusions undermine Davis's claims of ineffective assistance of counsel concerning counsel's failure to object to the interjection of race into the proceedings and failure to object to the PSR, and, in particular, the imposition of the five-level increase. As such, Davis's claims concerning the four statements fail under the prejudice prong of *Strickland*, and his challenge to the PSR fails under both the deficiency and prejudice prongs of *Strickland*.

Lastly, Davis argues his counsel was ineffective for failing to file a motion to suppress evidence seized from his gold Mercedes Benz. Davis claims that he insisted counsel file a motion to suppress because he was coerced into signing the consent form by the FBI agent who told him that

if he did not sign it that he "would call the cop for weed." (Document No. 178, p. 8).

The law is clear that a warrantless search violates the Fourth Amendment unless an exception to the warrant requirement applies. *United States v. Vega*, 221 F.3d 789, 798 (5th Cir. 2000). Consent is an exception to the warrant requirement. Consent may be given either from the person whose property is being searched, or from a third party who possesses common authority over the premises. *See Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990); *United States v. Mattock*, 415 U.S. 164 (1974).

Here, the trial testimony shows that when Davis's car was stopped he had executed an illegal U-turn in an attempt to evade federal agents. Officers detected the smell of marijuana when he rolled the window down and marijuana was visible in the console. (Document No. 92, Transcript of Day 2 of Trial, March 23, 2010, p. 306-311). Davis also signed several written consent forms. The first, form "FD-26" for a search of vehicle. (Document No. 92, p. 312-313), a consent to search his laptop computer, and a third consent for all other items in the car. (Document No. 92, p. 313-317). Davis's allegations are conclusory at best and wholly unsupported. He fails to make any credible argument that, under the circumstances, it was objectively unreasonable for counsel not to challenge the constitutionality of searches given his signed Consent to Search Forms he executed. Moreover, the record shows that counsel lodged a running objection to any testimony concerning any evidence resulting from the traffic stop. For instance,

> Mr. Justin: Your Honor, if I may, I object to any further testimony concerning any evidence, as a result of this traffic stop and that officer–there was not probable cause to detain the Defendant or the Defendant's car.
>
> The Court: Overruled.
>
>            *                 *                *
>
> Mr. Justin: May I have a running objection as to any of this other testimony concerning any evidence that was gathered as a result of this stop of the vehicle and the detention of the Defendant.

(Transcript of Day 2 of Trial, March 23, 2010, p. 308 & 310); *see also* (Document No. 92, p. 315, 318, 323, 325, 388-399, 424, 434). Because Davis's arguments concerning the alleged failure by counsel to file a motion to suppress are without merit, his counsel was not ineffective for failing to raise them. *See, e.g., Turner v. Quarter man*, 481 F.3d 292, 298 (5th Cir. 2007)("[Counsel cannot have rendered ineffective assistance of counsel by failing to make an objection that would have been meritless."); *Clark v. Collins*, 19 F.3d 959, 966 (5th Cir. 1994)("Failure to raise meritless objections is not ineffective lawyering; it is the very opposite."). Upon this record, Davis has not shown that counsel's decision not to file a motion to suppress fell below that of *Strickland*.

In conclusion, Davis has offered no proof that deficient performance prejudiced him in any way. *See Strickland,* 466 U.S. at 687. Thus no relief is available under § 2255 on Davis's ineffective assistance of counsel claims.

## III.  Conclusion and Recommendation

Based on the foregoing, it is

RECOMMENDED that the Government's Motion to Dismiss Movant's § 2255 Motion (Document No. 170) be GRANTED, and that Movant's § 2255 Motion (Document No.163) be DENIED.

The Clerk shall file this instrument and provide a copy to all counsel and unrepresented parties of record. Within 14 days after being served with a copy, any party may file written objections pursuant to 28 U.S.C. § 636(b)(1)(C), Fed.R.Civ.P. 72(b), and General Order 80-5, S.D. Texas. Failure to file objections within such period shall bar an aggrieved party from attacking factual findings on appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Ware v. King*, 694 F.2d 89 (5th Cir. 1982), *cert. denied*, 461 U.S. 930 (1983); *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982) (en banc). Moreover, absent plain error, failure to file objections within the fourteen day period bars an

aggrieved party from attacking conclusions of law on appeal. *Douglass v. United Services Automobile Association*, 79 F.3d 1415, 1429 (5th Cir. 1996). The original of any written objections shall be filed with the United States District Clerk, P.O. Box 61010, Houston, Texas 77208.

Signed at Houston, Texas, this 21st day of August, 2015.

Frances H. Stacy
United States Magistrate Judge